**In re DAVID JONES BUILDER, INC., Debtor.**

**Milton Gene FRIEDMAN, Trustee, Plaintiff,**

v.

**Jordan E. GINSBURG, Defendant.**

**Bankruptcy No. 89–25530–BKC–SMW.**
**Adv. No. 90–0709–BKC–SMW–A.**

United States Bankruptcy Court, S.D. Florida.

July 25, 1991.

Katherine S. Barry, Marc R. Pollack, Rotella & Boone, P.A., Fort Lauderdale, Fla., for trustee.

Kenneth Scherer, Ackerman, Bakst, Lauer & Scherer, P.A., West Palm Beach, Fla., for defendant.

## MEMORANDUM OPINION AND ORDER ON TRUSTEE'S COMPLAINT TO AVOID PREFERENTIAL TRANSFERS

WILLIAM H. BROWN, Bankruptcy Judge, Sitting by Assignment.

This proceeding, having come on for nonjury trial before this Court on March 27, 1991, and the Court having heard the testimony of live witnesses as well as depositions read into the record, having reviewed the documents submitted into evidence by the parties, having heard argument of counsel, and having reviewed written memorandum submitted by counsel, and being otherwise advised in the premises,

THE COURT HEREBY makes the following findings of fact and conclusions of law.

This is an adversary proceeding filed pursuant to 11 U.S.C. §§ 547 and 550 by the Trustee, Milton Gene Friedman, ("Trustee") against an individual, Jordan E. Ginsburg, ("Ginsburg") seeking the avoidance and turnover of allegedly preferential transfers or their value ($114,999.65 plus

prejudgment interest), made by the debtor within one year prior to the filing of the original petition by the debtor on October 24, 1989. The defendant has pled exception defenses under § 547(c)(1) (contemporaneous exchange for new value) and § 547(c)(2) (ordinary course of business transfers).

The proceeding arises in and is core to the Chapter 7 bankruptcy case of David Jones Builder, Inc. ("Debtor") pending in the Southern District of Florida, which originally began as a voluntary Chapter 11 case. It was thereafter converted to a Chapter 7 case by court order dated February 28, 1990, and the Trustee was appointed on February 28, 1990. The Trustee, within the applicable two-year limitation imposed by 11 U.S.C. § 546(a)(1), filed this adversary proceeding on December 17, 1990.

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. §§ 547 and 550. This is a core proceeding under 28 U.S.C. § 157(b)(2)(F).

In the parties' Joint Pretrial Statement, certain uncontroverted facts are stated, which include:

1. The plaintiff, Milton Gene Friedman, is the duly appointed, qualified and acting Trustee of the estate of the above-named debtor, having been permanently appointed by the Court on February 28, 1990.

2. The defendant, Jordan E. Ginsburg, was at all times pertinent hereto, from July, 1988 to October, 1989, the Chairman of the Board of Directors of First Commercial Bank, ("FCB") a commercial bank then authorized by the laws of the State of Florida to do business in Palm Beach County, located at 1515 N. Federal Highway, Boca Raton, Florida 33445.

3. The debtor, David Jones Builder, Inc. was at all times since its inception until February 28, 1990, when its bankruptcy case was converted to a Chapter 7, in the business of construction-related work involving concrete placement and forming, acting as a subcontractor in the building of commercial structures.

4. On or about July 11, 1988, the sum of $1,000,000.00 was transferred from the defendant and was deposited into the debtor's operating account at FCB, Account No. 10101381501, and the Promissory Note was executed by the debtor to Ginsburg in connection with this transfer, also dated July 11, 1988, and also in the amount of $1,000,000.00. (Plaintiff's Tr. Ex. 3)

5. The Promissory Note was personally guaranteed by David Jones pursuant to a Stock Pledge Agreement dated August 17, 1988, which pledged 84 shares of the debtor's stock owned personally by David Jones as security for the $1,000,000.00 loan from the defendant to the debtor. (Plaintiff's Tr. Ex. 4) Pursuant to Paragraph IX of the Stock Pledge Agreement, the defendant had the right to sell the 84 shares upon the debtor's default of its obligations under the Promissory Note, and any deficiency in the proceeds of sale necessary to cover the amount due to the defendant at that time was to remain a personal liability of David Jones.

6. David Jones was, by virtue of his majority stock ownership in the debtor and by virtue of being the debtor's president and chief operating officer, as well as a member of the debtor's Board of Directors, an "insider" of the debtor as defined by 11 U.S.C. § 101(30).

7. During the one year prior to the date of the filing of the Chapter 11 bankruptcy petition by the debtor, from October 24, 1988, to October 24, 1989, monthly payments of interest were made to the defendant from the debtor, pursuant to the terms of the Promissory Note as originally executed.

8. These payments were all made by the debtor's checks from its operating account at FCB and were as follows:

| Date | Check No. | Amount |
|---|---|---|
| 10/27/88 | 011010 | $ 10,833.33 |
| 10/31/88 | 011084 | $ 10,833.33 |
| 11/15/88 | 011222 | $ 10,833.33 |
| 12/19/88 | 011469 | $ 11,250.00 |
| 01/09/89 | 011646 | $ 11,250.00 |
| 03/15/89 | 012234 | $ 12,916.66 |
| 03/15/89 | 012234 | $ 11,250.00 |
| 04/13/89 | 012376 | $ 12,083.33 |
| 05/08/89 | 012514 | $ 12,083.33 |
| 07/12/89 | 012970 | $ 11,666.67 |
| | Total | $114,999.65 |

THE COURT HEREBY FURTHER FINDS, from the evidence presented at trial, the following facts:

9. FCB, at all times pertinent hereto, was the banking institution in which the debtor kept its operating and payroll accounts, and with which it had loans. (Jones 1/23/91 Deposition, Plaintiff's Tr. Ex. 2, pp. 20, 24–25; Tucker 5/11/90 Deposition, Plaintiff's Tr. Ex. 14, pp. 3–4; Plaintiff's Tr. Exs. 11, 12, 13)

10. The monetary transaction between Ginsburg and the debtor was initially characterized by the parties as an "investment," consisting of $1,000,000.00 to be transferred from Ginsburg in exchange for a "sale" of 84 shares of the 450 then-outstanding shares of the debtor's stock, which stock was owned in its entirety by David Jones, president and chief operating officer of the debtor. (Plaintiff's Tr. Ex. 6; Jones 1/23/91 Deposition, Plaintiff's Tr. Ex. 2, pp. 9, 38–39; Tucker 5/11/80 Deposition, Plaintiff's Tr. Ex. 14, p. 51; Ginsburg 10/9/90 Examination, Plaintiff's Tr. Ex. 7, p. 160)

11. Thereafter, Ginsburg decided to become a lender rather than an investor in the debtor, and the "sale" of the 84 shares was converted into a loan to the debtor of $1,000,000.00 by Ginsburg, in exchange for a Promissory Note executed by the debtor to Ginsburg dated August 17, 1988. This Promissory Note was later re-typed and back-dated to July 11, 1988, which was the date the money was transferred, and the note was re-executed by the debtor. (Plaintiff's Tr. Exs. 3, 4, 11; Ginsburg 10/9/90 Examination, Plaintiff's Tr. Ex. 7, p. 152; Plaintiff's Tr. Ex. 33)

12. The primary reason the defendant made the loan and transferred $1,000,000.00 to the debtor's bank account, however, was not either to invest in the debtor or to make a loan to the debtor, but to cover an overdraft in the debtor's operating account at FCB of $972,286.70 which existed on July 11, 1988. (Plaintiff's Tr. Ex. 11) This overdraft amounted to an unsecured loan from the bank to the debtor. There were FDIC or other bank regulators present at the bank at the time questioning this large overdraft in the debtor's account, and the defendant Ginsburg, chairman of the board of the bank, did not want the bank regulators to investigate further into the bank's affairs or its banking relationship with the debtor, which investigation might cause the bank to lose its A–2 rating, among other possible repercussions. (Jones 1/23/91 Deposition, Plaintiff's Tr. Ex. 2, pp. 25–26; Tucker 5/11/90 Deposition, Plaintiff's Tr. Ex. 4, pp. 39–40; Ginsburg 10/9/90 Examination, Plaintiff's Tr. Ex. 7, pp. 143–144, 184)

13. Although the defendant's initial investment in the debtor was never memorialized in a stock certificate (Ginsburg 10/9/90 Examination, Plaintiff's Tr. Ex. 7, p. 165), it was reflected in the Schedule K–1 for the defendant as a shareholder, which is attached to the debtor's 1988 income tax return (Plaintiff's Tr. Ex. 6), as well as in correspondence from the debtor's attorney, John Raymond. (Plaintiff's Tr. Ex. 36) The defendant acknowledged that at some point he had been a stockholder and admitted claiming a loss on his tax returns as a shareholder of the debtor. (Ginsburg 10/9/90 Examination, Plaintiff's Tr. Ex. 7, pp. 160–161)

14. As evidenced by the pretrial stipulation of the parties, none of the five legal criteria of § 547(b), on which the plaintiff bore the burden of proof at trial, were agreed upon as true in advance of trial. Likewise, no element of §§ 547(c)(1) or (2), defenses on which the defendant bore the burden of proof at trial, was agreed upon as true in advance of trial. *See* 11 U.S.C. § 547(g). Therefore, each element of §§ 547(b), (c)(1) and (c)(2) will be discussed herein.

### 11 U.S.C. § 547(b)

The essential elements of an avoidable preferential transfer are found in 11 U.S.C. § 547(b) which provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not yet been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

### DISCUSSION

*Section 547(b)(1):* Whether or not an interest in property of the debtor was transferred to or for the benefit of a creditor.

██ A transfer is broadly defined in 11 U.S.C. § 101(54). The uncontested evidence at trial was that checks were written by the debtor from its regular operating bank account at FCB, and accepted and cashed by Ginsburg, during the one year prior to the filing of the debtor's bankruptcy petition. (Copies of the checks were Plaintiff's Tr. Ex. 5) No evidence was presented by Ginsburg which would tend to dispute this in any respect. The checks total $114,999.65 and the dates of the transfers and amounts of each are as stated previously in the listing of the checks.

The receipt of these payments obviously benefitted Ginsburg who was a creditor of the debtor. *See* 11 U.S.C. § 101(9). The payments also benefitted another of the debtor's creditors, David Jones, president and chief operating officer of the debtor, inasmuch as he had personally guaranteed the debtor's note to Ginsburg and had pledged his personally-owned stock of the debtor as collateral. (Plaintiff's Tr. Ex. 4)

*Section 547(b)(2):* Whether or not the transfers of the debtor's property was made for or on account of an antecedent debt owed by the debtor before such transfers were made.

As to § 547(b)(2), the question raised is whether each of the interest payments

was a payment on an antecedent debt. The cases which discuss whether interest payments may be avoidable as preferential transfers address the subject in the context of the § 547(c) exceptions to recovery.[1] It would appear that interest payments must first be shown to have been payments on an antecedent debt or the exceptions never come into play. Obviously, one view is that the obligation to pay interest arises with and from the note; therefore, any interest paid after the inception of the note is an antecedent debt. The other view is that "[i]nterest is simply rent for the use of money," and that the debt for interest is "not incurred until [the obligor] actually used the money." *In re Iowa Premium Service Co., Inc.*, 695 F.2d 1109, 1111–1112 (8th Cir.1982) (where the Court was considering the former 45–day rule under the now amended § 547(c)(2)). "Although 'antecedent debt' is not defined by the Code, essentially a debt is 'antecedent' if it is incurred before the transfer." 4 King, COLLIER ON BANKRUPTCY, ¶ 547.05 (15th ed.). It would appear that a debt is only incurred "when a debtor becomes legally bound to pay." *In re Gold Coast Seed Co.*, 751 F.2d 1118, 1119 (9th Cir. 1985); *In re Walkington*, 62 B.R. 989 (Bankr.W.D.Mich.1986). This Court is required to decide whether an interest payment made on or before the due date would or would not be a payment on an antecedent debt, because in the present case the facts demonstrate that two of the ten interest payments apparently were made prior to the date called for in the note.

■ This note required interest, at a variable rate, to be payable "commencing on August 11, 1988, and on the 11th day of each and every consecutive month thereafter ..." (Plaintiff's Tr. Ex. 3) The actual interest payment schedule has been previously set out in this opinion, demonstrating that all but two of the payments were made later than the eleventh of each month. One payment was made on January 9, 1989 and one on May 8, 1989. Assuming that the January 9 and May 8 payments were the payments due for January 11 and May 11, 1989, they were paid two and three days early, respectively, and therefore could not be payments on an antecedent debt. There is logic to this conclusion. First, the debtor was not legally obligated to pay interest until the due date thereof. Also, recognizing that the Trustee is attempting to recover those ten payments made within the one year reach back period under § 547(b)(4)(B), and recognizing that the schedule of payments previously shown in this opinion may not include all of the interest payments made, and further recognizing that the proof is missing on which payments applied to which due date under the note, and recalling that the Trustee has the burden of proof under § 547(b), logic would indicate that the 10/27/88 payment was for September 11; the 10/31/88 payment was for October 11; the 11/15/88 payment was for November 11; the 12/19/88 payment was for December 11, 1988; the 1/09/89 payment was for January 11; the two payments made on 3/15/89 were for February 11 and March 11; the 4/13/89 payment was for April 11; the 5/08/89 payment was for May 11; and the 7/12/89 payment was for June 11. Each payment was beyond the due date and thus a payment on an antecedent interest debt under the terms of the note, except for the January 9 and May 8, 1989 payments.

■ The Court is thus adopting, for purposes of § 547(b)(2), the theory of Judge A.J. Cristol, in *In re Martec Corp.*, 127 B.R. 65 (Bankr.S.D.Fla.1991), in which he held that as to a note in which the debtor

1. See, e.g., *In re CHG Int'l., Inc.*, 897 F.2d 1479 (9th Cir.1990); *In re ZZZZ Best Co., Inc.*, 921 F.2d 968 (9th Cir.1990), *cert. granted,* —— U.S. ——, 111 S.Ct. 2009, 114 L.Ed.2d 97 (1991); *In re Smith–Douglass, Inc.*, 842 F.2d 729 (4th Cir. 1988); *In re Iowa Premium Service Co., Inc.*, 695 F.2d 1109 (8th Cir.1982); *Barash v. Public Fi-* *nance Corp.*, 658 F.2d 504 (7th Cir.1981); *In re Martec Corp.*, 127 B.R. 65 (Bankr.S.D.Fla.1991); *In re Walkington*, 62 B.R. 989 (Bankr.W.D.Mich. 1986); *In re Georgia Steel, Inc.*, 56 B.R. 509 (Bankr.M.D.Ga.1985), *rev'd on other grounds,* 66 B.R. 932 (M.D.Ga.1986); *In re Top Sport Distributors, Inc.*, 41 B.R. 235 (Bankr.S.D.Fla.1984).

has "the option to pay the principal of the debt in full prior to the expiration of the Note without penalty [, ...] the Debtor was obligated to pay interest only for the time it actually used the money." *Id.* at 67.[2] Under this theory, the question of whether a debt is an antecedent debt would be guided by the terms of the note creating the legal obligation and by the periods for which interest usage is due. Here, we have some proof that the January and May payments were prepayments, and the Trustee did not offer proof to the contrary, except for general proof that the debtor was frequently late in its interest payments. (Jones 1/23/91 Deposition, Plaintiff's Tr. Ex. 2, pp. 45, 53, 57, 68; Tucker 3/15/91 Deposition, Plaintiff's Tr. Ex. 15, p. 10; Ginsburg 10/9/90 Examination, Plaintiff's Tr. Ex. 7, pp. 152-3) We do not have any payments on the $1,000,000.00 principal, which was due on July 11, 1989. (Plaintiff's Tr. Ex. 3) The Court has concluded that, for purposes of § 547(b)(2), it will not look to the July 11, 1988 date of the note, which would automatically render even timely interest payments to be payments on an antecedent debt. Rather, the Court views the principal payment and the interest payments for usage of the principal as separate types of debt for which different dates of legal obligations to pay apply. The Court finds factual justification for looking to those different dates for antecedent debt purposes. *Compare, In re Martec, supra,* and the cases in footnote 1, most of which follow the same analysis for § 547(c) purposes.

As a result, the Court concludes that of the checks sought to be avoided, the Trustee may not avoid check number 011646 transferred on January 9, 1989, for $11,250.00 and check number 012514 transferred on May 8, 1989, for $12,083.33, those amounts not being transfers on an antecedent debt.[3]

*Section 547(b)(3):* Whether or not the transfers were made while the debtor was "insolvent."

▮ The Bankruptcy Code's definition of insolvency is contained within 11 U.S.C. § 101(31) to mean a

financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation

...

This is a balance sheet test inquiring into whether the debtor's liabilities out-weighed its assets when the transfers were made during the one year prior to the filing of the petition. Insolvency must be established on the dates of each transfer or continuously for the periods of the transfers. *In re Royal Golf Products Corp.,* 908 F.2d 91, 95 (6th Cir.1990).

▮ Evidence was presented by the plaintiff on this issue, including a number of documents, as well as testimony of the former assistant comptroller of the debtor, Thomas Tucker; testimony of Mark Landau, the certified public accountant who had been in charge of preparing the debtor's 1988 tax return and financial statement for the debtor's accounting firm, Millward and Company; and testimony of the Trustee. The very fact that the debtor needed an injection of $1,000,000.00 to cover an overdraft on July 11, 1989 of $972,286.70 is some evidence of insolvency. (Plaintiff's Tr. Ex. 11) However, the mere inability to pay debts as they come due, or operating losses, would not alone satisfy the insolvency test. *See, e.g., Briden v. Foley,* 776 F.2d 379 (1st Cir.1985).

▮ During the periods of the transfers, the debtor was continuing in business; therefore, a "going concern" value of the debtor's assets may be used, unless the business is "on its deathbed." *In re Taxman Clothing Co.,* 905 F.2d 166, 170 (7th

**2.** The note in question in this proceeding specifically permits prepayment without penalty. Paragraph (4) of Plaintiff's Tr. Ex. 3.

**3.** The backs of the checks indicate that the January 9, 1989 check was honored on January 10, 1989, and the May 8, 1989 check was honored on May 10, 1989, both dates still prior to the 11th due date. (Plaintiff's Tr. Ex. 5)

Cir.1990); *see also In re Art Shirt Ltd., Inc.*, 93 B.R. 333, 334 (E.D.Penn.1988).

Both Mr. Landau and Mr. Tucker testified as to the poor financial condition of the debtor throughout the one year prior to the bankruptcy, which includes the dates of the suspect transfers. Mr. Landau testified that he did the underlying work for preparation of the 1988 income tax return of the debtor (Plaintiff's Tr. Exs. 6 & 19), showing that it suffered a loss that calendar year of approximately $4,000,000.00. Mr. Landau utilized financial information supplied to him by the debtor.

He also prepared the 1988 year end financial statement of the debtor (Plaintiff's Tr. Exs. 21 and 22), which he testified was only a "review" statement, the lowest standard utilized by generally accepted accounting principles in preparing a financial statement. In such a corporate financial statement, the representations of management are utilized by the certified public accountant, who is not required to review the corporation's records backing up such representations. The "Accountants' Review Report" which is page two of the financial statement (Plaintiff's Tr. Ex. 21) contains the following remarks:

> The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note A to the financial statements, the Company has suffered recurring losses from projects completed in the past year, has insufficient profit margins on projects currently being worked on and has a negative capital deficiency that raises substantial doubt about its ability to continue as a going concern ... The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

This harsh warning was toned down in the revised statement. (Plaintiff's Tr. Ex. 22)

Mr. Landau acknowledged in his direct examination at trial that the financial statement, which shows year end total assets of the debtor as being $8,748,975.00, and total liabilities as being $8,209,639.00, failed to reflect a $1,000,000.00 loan, a liability,

made to the debtor in approximately October, 1988 by either or both of Messrs. Nicholson, a transfer from them separate from the $1,000,000.00 investment they had made in the debtor in July, 1988. Further, the $1,000,000.00 transfer from Mr. Ginsburg was not shown on this statement as a loan.

These omissions alone would be enough to make the debtor's liabilities outweigh its assets during at least the last quarter of 1988, which included the time period of the first four interest payments. These omissions did not stand alone, however. Note B to the financial statement informs the reader that no allowance for bad debts is being made in it. Note A to Plaintiff's Trial Exhibit 21 states that:

> The Company has had losses on most jobs completed during the period and profit margins on on-going jobs are insufficient to generate enough capital to support daily operations, including the debt servicing requirements as more fully disclosed in Notes E, I, J, K and L. The Company is dependent on an infusion of additional working capital and attaining a level of profitable operations to generate adequate cash to discharge liabilities as they come due. The financial statements do not include any adjustments relating to the recoverability and classification of liabilities that might be necessary should the Company be unable to continue in its present form ...

Property and equipment was reflected on Plaintiff's Trial Exhibits 21 and 22 at historical costs, less depreciation, which would not necessarily reflect current market or on-going business values. The current asset values were not verified, and the accounts receivable contained no allowances for anticipated back charges.

As of 1988 year end, the company was losing approximately $3.6 million, with a retained earnings deficit of $3.2 million. (Plaintiff's Tr. Ex. 22, p. 5) It was Mr. Landau's conclusion that the debtor was losing money on its major jobs by allowing its expenses to overrun the contract amounts. This is a picture of a bleeding company with little reason for optimism

that it could continue to operate. The on-going business value would be adversely affected by this financial picture.

Mr. Landau further testified that Millward & Co. was requested during 1988 to prepare an audited financial statement for the first half of that year. However, the field work on that undertaking was halted because it appeared that an audited statement would present a worse financial picture of the corporation than had the review statement of six months prior. Mr. Landau's handwritten notes to his file on the debtor at that time (Plaintiff's Tr. Ex. 24) reflected meetings held about this situation with the debtor's legal counsel, John Raymond, and one of the debtor's "investors," Jordan Ginsburg, at which the determination was made to stop the audit and not issue a report "while the company re-evaluated" its position.

Mr. Tucker's testimony corroborated and enlarged the picture of the debtor's finances which was portrayed by Mr. Landau, from the perspective of a company employee privy to knowledge about the debtor's finances during the time period relevant to these transfers. He had occasion to review the monthly financial information, from which it was clear that overdrafts were common throughout the year prior to the bankruptcy. (Plaintiff's Tr. Exs. 11, 12, 13) He stated his opinion that the receivables estimated by the 1988 financial statement to be $2,242,479.00, proved during 1989 to be overstated by approximately $300,000.00. He testified that the estimated earnings on uncompleted jobs shown on the statement to be $1,453,535.00 was proven during 1989 to be substantially overstated because estimated costs to complete the jobs was understated by a "significant amount." (Compare Plaintiff's Tr. Exs. 17 & 18) The company frequently misstated amounts on internal documents.

Further, Mr. Tucker estimated that the historical value (cost less depreciation), ascribed to the construction equipment, vehicles, office furnishings and equipment on the financial statement was perhaps thirty percent greater than the actual fair market value of such personal property of the debtor at that time. This would amount to an asset reduction in excess of $900,000.00.

Mr. Tucker was also able to corroborate the existence of the October 1988 $1,000,000.00 loan from Ginsburg to the debtor which was not included as a liability on the financial statement. This would increase liabilities to $9.2 million. With necessary corrections to the financial statement, Mr. Tucker testified that the debtor was insolvent on December 31, 1988. At mid year 1988, he stated that the financial picture was worse. Throughout Mr. Tucker's time at the company, February 1988 to March, 1990, he testified that the debtor was insolvent.

It is clear from the testimony and exhibits that the financial picture of the debtor continued to deteriorate during 1989 until the debtor filed its Chapter 11 bankruptcy petition on October 24, despite additional large infusions of cash from FCB and the Nicholsons. David Jones stated that the Nicholsons put around $5,000,000.00 into the company, beginning with the July 1988 million. (Jones 1/23/91 Deposition, Plaintiff's Tr. Ex. 2, p. 41)

The Trustee was able to testify regarding the assets and liabilities which were listed on the petition (Plaintiff's Tr. Ex. 26) and those he actually found to exist when he became Trustee in this case. The Summary of Debts and Property in the petition reflects Schedule A total liabilities of $6,734,669.42 and Schedule B total assets of $4,506,388.21. *See, e.g., In re Pembroke Development Corp.*, 122 B.R. 610 (Bankr. S.D.Fla., 1991), where the Court placed great weight on the debtor's valuation of its assets and liabilities in the petition in determining the solvency of the debtor during the preference period.

The Trustee pointed out that the values of assets listed in the petition were stated in the petition *not* to be at current market values. *Compare* 11 U.S.C. § 101(31)(A). Schedule B-2 of the debtor's petition repeatedly states the following: "This value is carried on debtor's books at cost less depreciation and does NOT reflect current market value." Based on the bankruptcy

definition, the Trustee concluded that the debtor was insolvent on the date of the bankruptcy filing.

Further, as testified to by the Trustee, almost all of the assets of the debtor turned out to have outstanding purchase money debt or security interests in excess of the value of each item. For example, the office building and construction yard owned by the debtor and valued on Schedule B–1 at $1,000,000.00 had a first mortgage debt of $850,000.00 plus accrued interest and a second mortgage debt of $1.7 million. A foreclosure judgment on the building was admitted. (Plaintiff's Tr. Ex. 29) The major pieces of construction equipment and vehicles (tower cranes, concrete forming equipment, loaders, backhoes, and trucks) were all repossessed by the creditors having perfected security interests in such assets. At least two creditors had perfected blanket liens on all personalty of the debtor. One of these blanket lien creditors had been assigned the debtor's rights to pursue collection of receivables supposedly due for construction jobs the debtor had performed. However, neither the Trustee nor this creditor to which accounts had been assigned had been able to collect any sums supposedly due to the debtor, despite rather extensive litigation, due to counterclaims of back charges, defenses of late or poor job performance, or non-completion of jobs by the debtor.

The Trustee testified further that the debtor's schedules reflected over $600,-000.00 due to the Internal Revenue Service, plus interest and penalties for unpaid payroll taxes, as well as several million dollars of unsecured debt. Tax liens have been filed for 940 and 941 taxes. (Plaintiff's Tr. Ex. 30)

The only source of funds expected to be collected by the Trustee are from avoidance actions filed and to be filed. The largest of these, however, an insider preference action filed by the Trustee against FCB seeking avoidance and turnover of approximately $1,000,000.00, was not expected by the Trustee to be ultimately successful in generating funds for the estate

because the FDIC had taken over the bank, which is now insolvent.

 It is clear that, in determining the issue of "solvency" for § 547 purposes, the Court may ignore pre- or even postpetition valuations of a debtor's assets that are overly optimistic or unrealistic. *In re Knapp,* 119 B.R. 285 (Bankr.M.D.Fla.1990). In light of all the evidence presented by the plaintiff on the issue of insolvency, this debtor's asset and on-going business values were overly optimistic or unrealistic.

Absolutely no testimony or documentary evidence was presented by the defendant on the issue of solvency, and the Trustee concluded after his review of the debtor's books and records that the debtor was insolvent throughout the year prior to the bankruptcy filing. This Court finds convincing evidence to support its conclusion that the debtor was insolvent when the interest payment transfers were made.

*Section 547(b)(4):* Whether or not the transfers were made within 90 days prior to the petition filing date or between 90 days and one year prior to the filing date if the benefitted creditor was an insider of the debtor.

The Trustee is proceeding upon two legal theories in his attempt to avoid the transfers made by the debtor to Ginsburg within the one year (rather than 90 days) prior to the bankruptcy filing date, and to have the value of these transfers turned over to him for the benefit of the debtor's estate.

One theory is under the *Deprizio* line of cases. *In re V.N. Deprizio Construction Co.,* 874 F.2d 1186 (7th Cir.1989); *In re Robinson Bros. Drilling, Inc.,* 892 F.2d 850 (10th Cir.1990); *In re C–L Cartage Co., Inc.,* 899 F.2d 1490 (6th Cir.1990). Under this theory, the Trustee is entitled to reach back a year, rather than just 90 days, for the purpose of avoiding and recovering transfers made to or for the benefit of a creditor having a guarantee of a borrower's obligation from an "insider" of the debtor borrower. The reasoning for this is that all repayments made by the borrower to the creditor on such a debt have benefitted the insider/guarantor by reducing his or her potential liability to the creditor. 11

U.S.C. § 550(a)(1) permits a trustee who has successfully avoided a preference to recover the property transferred or its value, from either "the initial transferee," the creditor to whom it was paid, or from "the entity for whose benefit such transfer was made," the insider/guarantor. This concept and interpretation, regarding who may be sued for recovery of the value of a preference under § 550(a)(1), has also been endorsed by the Eleventh Circuit in *In re Air Conditioning, Inc. of Stuart*, 845 F.2d 293, 296 (11th Cir.1988), *cert. denied*, 488 U.S. 993, 109 S.Ct. 557, 102 L.Ed.2d 584 (1988) (Court allowed recovery under § 550(a)(1) after concluding that the "indirect transfer arising from a debtor's pledge of security to a third party bank 'may constitute a voidable preference as to the creditor who indirectly benefitted from the direct transfer to the third party,'" quoting *In re Compton Corp.*, 831 F.2d 586, 591–92 (5th Cir.1987).

In the instant case, of course, the borrower was David Jones Builder, Inc., the bankruptcy debtor; the insider/guarantor/creditor who benefitted by the repayment was David Jones (see guarantee and stock pledge agreement, Plaintiff's Tr. Ex. 4); and the creditor to whom the transfers were made was Jordan Ginsburg. The Trustee could have sued either David Jones personally or Jordan Ginsburg under § 550(a)(1).

The typical defense to this *Deprizio* theory has been that it inequitably penalizes innocent outsider creditors, who had sought merely to further secure their corporate loans by obtaining guarantees from insiders. Although *Deprizio* rejects this argument altogether for various reasons, including a plain reading of § 550(a)(1), Jordan Ginsburg was neither an innocent nor an arms length outside lender to David Jones Builder, Inc. The relationships between and among the various players in this case (Jordan Ginsburg, First Commercial Bank, John Raymond, David Jones and the debtor), as well as the peculiar circum-

stances under which the loan from Ginsburg to the debtor was made, all bear witness to this. The question, therefore, of whether or not bankruptcy courts should be allowed to change a seemingly clearly written statute, 11 U.S.C. § 550(a)(1), under the pretext of equitable or policy considerations, simply is not reached in the instant case. This is not a case of a defendant who has "clean hands" and may therefore approach this Court seeking relief from this statute on an equitable basis.[4]

■ Moreover, the application of the *Deprizio* rationale is not necessary in order for the Trustee to recover from the defendant in this proceeding. The other theory upon which the plaintiff is proceeding, as it relates to § 547(b)(4), is that Jordan Ginsburg was himself an "insider" of the debtor and thus subject to the one year, rather than 90 day, reach back period for avoidance of the debtor's transfers.

There is the uncontroverted testimony of several witnesses, including Ginsburg, as well as documentary evidence presented at trial, that Jordan Ginsburg first transferred his $1,000,000.00 to the debtor in exchange for stock equivalent to approximately 20% of the outstanding shares of the corporate debtor David Jones Builder, Inc. In support of this, the debtor's 1988 federal income tax return (Plaintiff's Tr. Ex. 19) included a K–1 shareholder attachment for Jordan Ginsburg, showing him as a shareholder during that calendar year. Also, correspondence dated April 13, 1989, from attorney John Raymond, jointly to Jordan Ginsburg and William and Raymond Nicholson, (Plaintiff's Tr. Ex. 36) discusses the allocation of the debtor's 1988 losses among them as shareholders, stating: "The theory behind the allocation is simply, Mr. Ginsburg made a preliminary determination to become a shareholder in the corporation, but subsequently determined to become a lender rather than a shareholder." The defendant himself admitted that he was for some period of time a shareholder

---

4. Furthermore, the Supreme Court has clearly announced that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 968–69, 99 L.Ed.2d 169 (1988).

of the debtor. (Ginsburg Tr. Transcript, p. 14)

The Court agrees with the Trustee's position that the defendant Jordan Ginsburg subjected himself to the one year preference reach back period by deciding to initially become a shareholder and thus he became an insider of the debtor for Bankruptcy Code purposes. There is evidence that he continued to exert some insider control over the debtor after his transaction was changed to a loan.

*Section 547(b)(5):* Whether or not the creditor to whom transfers were made (within the year prior to the bankruptcy) received more than he would have under a chapter 7, if the transfers had not been made, and the creditor received payment only to the extent provided by the Bankruptcy Code.

The only evidence on this point was the Trustee's testimony. He testified that most of the debtor's tangible assets had been foreclosed upon or repossessed by secured creditors. (*See, e.g.,* Plaintiff's Tr. Ex. 29, a certified copy of the State Court Summary Final Judgment of Foreclosure of Debtor's Real Property dated 9/17/90) He further testified that the Internal Revenue Service was owed $660,985.07, plus interest and penalties for 1989 prepetition payroll taxes. (*See* Plaintiff's Tr. Ex. 30, certified copy of two federal tax liens against debtor) There are also administrative expenses to be paid. The Petition (Plaintiff's Tr. Ex. 26), Schedule A–3, reflects $2,455,095.98 due to general unsecured creditors by the debtor. The Trustee testified that, if administrative expenses were paid, priority claims would consume the balance of the estate.

■■■ The defendant Jordan Ginsburg is a general unsecured creditor of the estate of the debtor who will only be paid on an equal prorata basis as other general unsecured creditors, after priority creditors such as the Internal Revenue Service and administrative expenses of the estate have been paid. It is clear that unsecured creditors will not be paid in full in this bankruptcy. The § 547(b)(5) test is automatically satisfied whenever a general unsecured

creditor such as Ginsburg receives any payment within the preference period unless the estate is sufficient to pay unsecured claims in full. *In re Buyer's Club Markets, Inc.,* 123 B.R. 895 (Bankr.D.Colo. 1991). The test is made as of a hypothetical liquidation on the date the Chapter 11 bankruptcy petition was filed. *In re Royal Golf Products, Corp.,* 908 F.2d 91 (6th Cir.1990). The debtor's schedules support the conclusion that the estate was insufficient at filing to pay unsecured claims in full. (Plaintiff's Tr. Ex. 26)

## DEFENSES

■■■ In his proposed findings and conclusions, the defendant relied upon the exception under § 547(c)(2); however, in his answer the defendant also pled the exception of § 547(c)(1). The Court has analyzed both exceptions from preferential avoidance and has concluded that neither provides the defendant with a defense. The transferee/defendant has the burden of proving the § 547(c) exceptions. 11 U.S.C. § 547(g).

*Section 547(c)(1):* Whether the transfers were (A) intended by the debtor and the creditor (to whom or for whose benefit the transfers were made) to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange.

In paragraph 8 of his Answer and Affirmative Defenses, the defendant asserts a § 547(c)(1) defense and elaborates as follows:

The basis for this defense is that the alleged transfers, if any, were payments of current interest. A debt for interest is incurred on the date when the interest accrues. The continued extension of credit constitutes new value and the payment of interest was a contemporaneous exchange.

The defendant also argued that the interest payments,

were intended by the debtor, and Ginsburg, the creditor for whose benefit these payments were made, to be a contemporaneous exchange for new value, to wit, the continued use of the $1,000,-

000.00 that was loaned. Thus the interest obligation incurred by the debtor constituted new value on the date when the interest accrued for the continued extension of credit.

(Defendant's Findings of Fact and Conclusions of Law, pp. 4–5)

The § 547(c)(1) exception "is grounded in the principle that the transfer of new value to the debtor will offset the payments, and the debtor's estate will not be depleted to the detriment of other creditors." *In re Fuel Oil Supply & Terminating, Inc.*, 837 F.2d 224, 228 (5th Cir.1988), *quoting In re Auto–Train Corp.*, 49 B.R. 605, 612 (Bankr.D.C.1985). The Eighth Circuit has recently discussed the elements of § 547(c)(1) and concluded that the "existence of intent, contemporaneousness, and new value are questions of fact." *In re Lewellyn & Co., Inc.*, 929 F.2d 424, 427 (8th Cir.1991).

■ As to intent, the proof must demonstrate that each of the parties intended such an exchange. *Id.* at 428. It is the intent at the outset of the transaction that is critical. *In re Prescott*, 805 F.2d 719, 727–28 (7th Cir.1986).

■ Section 547(c)(1)(B) also requires proof that the transfer was *"in fact* [a] substantially contemporaneous [exchange]." *In re Arnett*, 731 F.2d 358, 362 (6th Cir.1984). Clearly, payment by check may or may not be a contemporaneous transfer, depending upon the facts. *In re Standard Food Services*, 723 F.2d 820 (11th Cir.1984).

■ The final element of new value must also be established. There must in fact be proof of some *value* in the "new value." *In re Jet Florida Systems, Inc.*, 861 F.2d 1555, 1559 (11th Cir.1988). The Eleventh Circuit also recognized that mere "[f]orebearance from exercising pre-existing rights does not constitute new value." *In re Air Conditioning Inc., of Stuart*, 845 F.2d at 298.

■ The questions to be answered, in determining whether the defendant has met his burden of proof with regard to § 547(c)(1) include the following:

(1) Did David Jones (an inside creditor for whose benefit the monetary transfers were made to Ginsburg) intend that each payment made by the debtor to Ginsburg would be a contemporaneous exchange for new value given to the debtor?

(2) Did Jordan Ginsburg (the defendant creditor to whom the transfers were made) intend each transfer to him from the debtor to be a contemporaneous exchange for new value given by him to the debtor?

(3) Did the debtor, David Jones Builder, Inc., intend for its interest payments to Ginsburg to be contemporaneously exchanged for new value given to it by Ginsburg?

(4) What was the "new value" which was intended by any or all of these parties to be contemporaneously exchanged for each interest payment made by the debtor to Ginsburg?

The defendant did not address any of the above evidentiary questions at trial by presenting any testimony on the intent or state of mind of either the debtor, David Jones, or Ginsburg. The only trial testimony or evidence presented by either party, as to the state of mind or intent of any of the above parties at the time the transfers to Ginsburg were made, appears to be found in a small portion of David Jones' Deposition, which was read into the record by Plaintiff's counsel, which testimony merely established that the company was obligated to pay interest according to the terms of the note. (Jones 1/23/91 Deposition, Plaintiff's Tr. Ex. 2, pp. 57–58)

However, the interest was not always paid monthly and the payments were often late. There is no proof that Ginsburg was threatening to call the principal on the note; in fact, there is proof that the note was extended from its original due date. (Plaintiff's Tr. Ex. 36) There is no proof that the extension was tied to interest payments being made.

The defendant chose not to testify at the trial and this Court does not believe that any of the parts of his prior examination could be construed as lending support to the proposition that the defendant intend-

ed, either at the time the original loan transaction was entered into or at the time any particular interest payment was made to him, that such interest payments would be a contemporaneous exchange for some "new value" which was being given by him to the debtor. Rather than the defendant's "intentions" being directed at contemporaneous exchange and/or new value, they were directed at avoiding closer FDIC scrutiny of FCB's affairs and the $972,000.00 overdraft in the operating account of the debtor.

Since testimonial evidence on these intent issues is lacking, then the question becomes whether intent can be legally inferred from the documents presented as evidence at trial. The two Promissory Notes (Plaintiff's Tr. Ex. 3) dated July 11, 1988 set forth the terms and conditions of repayment of the $1,000,000.00 loan. Mr. Landau testified that this Note was categorized as a "long term" note payable on the debtor's financial statement, and defendant's counsel, Mr. Ken Scherer, apparently agreed with this categorization in his closing arguments to the Court at trial. The Court would agree that the Note is a long term debt and that it does not evidence a short term credit transaction, such as the delivery of goods either C.O.D. or within a normal trade period. The Note is not a revolving line of credit, and it is not a demand note which the lender may choose to call due in full at any point he chooses. The Note calls for monthly payments of interest, at 3% over the prime rate of Manufacturers Hanover Trust Company over the course of one year, and then a balloon payment of principal and any unpaid interest. There is a 15 day grace period included in Paragraph (1) of the Note, and only after failure of the borrower to make a payment prior to or within this 15 day period is the lender entitled to call the entire balance due on the Note. The Note contains no prepayment penalty; however, partial prepayment does not relieve the borrower from continuing to make its regular monthly payment under the note. The note, as well as the rights and obligations of the parties are to be construed in accordance with Florida law.

The Court can find nothing in the interest payments which transferred new value to the debtor's estate. The debtor already had the $1,000,000.00 principal, and the interest payments merely depleted the debtor's estate without any proof that the estate received anything other than possible forbearance on the potential rights of Ginsburg under the note. The parties' rights were fixed in the original note, and the interest payments or credits added no new value to the debtor. *See In re Chase & Sanborn Corp.,* 904 F.2d 588, 595–6 (11th Cir.1990). As previously stated, forbearance is not new value. *In re Air Conditioning Inc., of Stuart,* 845 F.2d at 298. Moreover, the interest payments were frequently and most commonly late, and there is no proof that the late payments were substantially contemporaneous exchanges.[5]

The defendant failed to prove the elements of § 547(c)(1).

*Section 547(c)(2):* Whether or not the transfers to the defendant were made (A) in payment of a debt incurred by the debtor in the ordinary course of the business or financial affairs of the debtor and the defendant; and (B) in the ordinary course of the business or financial affairs of both the debtor and the defendant; and (C) according to ordinary business terms.

The defendant presented no evidence at all that the $1,000,000.00 debt to the defendant *was* incurred by the debtor in the ordinary course of business of both the debtor and defendant. The plaintiff, on the other hand, presented evidence, including the testimony of the defendant himself through his examination, tending to show that the loan was *not* made in the ordinary course of either party's usual or customary business or financial affairs.

In contrast to the prior analysis under § 547(b)(2) where the Court looked solely to the date the interest payments were made, for purposes of § 547(c)(2) the Court has

---

5. The Court has already determined that the prepayment of interest on January 9, 1989, and on May 8, 1989, were not payments on an antecedent debt.

examined both the date and terms of the original note obligation and the dates of the interest payments in an effort to determine if the defendant, under either approach, has proven each of the essential elements of § 547(c)(2). Again, the Court favors the approach of looking to the date of interest payments as seen in *In re Martec Corp.*, 127 B.R. 65, but in *Martec* Judge Cristol found that the debtor "in fact, paid [the interest] charges in the ordinary course of its business—at the end of each month in which the Debtor used the Loan proceeds." 127 B.R. at 67–68. The same factual finding can not be reached here.

█ An analysis of the pertinent facts surrounding this loan and the interest payments reveals the following:

The defendant's own pretrial sworn testimony (defendant took the Fifth Amendment at trial and refused to testify at all) was that he had not been acquainted with David Jones at all prior to Jones and his company becoming customers of FCB. (Ginsburg Tr. Transcript, p. 2)

Ginsburg could not remember if he had ever met Mr. Jones prior to making the $1,000,000.00 transfer to the debtor, which was at that time solely owned and operated by Mr. Jones. (Ginsburg Tr. Transcript, pp. 5, 6) The defendant further testified that he was not in the habit of loaning strangers $1,000,000.00 of his personal money (Ginsburg Tr. Transcript, p. 6), and that he could not remember any other time that he had made a personal loan to one of FCB's customers. (Ginsburg Tr. Transcript, p. 20) There was only testimony that Mr. Ginsburg had loaned up to $75,000.00 to other individuals in the past. (Testimony of Maxine Feller)

Why did the defendant, who was chairman of the board of directors of FCB, of which the debtor was a customer, transfer $1,000,000.00 to the debtor on July 11, 1988. The defendant's own testimony was that he did it because the debtor was "overdrawn in the bank" (Ginsburg Tr. Transcript p. 6), and "that was the week it was either the FDIC or the Federal Reserve or the state banking people were in." (Ginsburg Tr. Transcript, p. 7)

The bank statements of the debtor's operating account with FCB for July, 1988 (Plaintiff's Tr. Ex. 11) shows that on the date July 11, 1988, when the defendant's $1,000,000.00 was transferred to the debtor and deposited into that account, an overdraft of over $972,000.00 existed in the account.

The defendant testified that he had no reason for transferring the money to the debtor other than because of the overdraft at the bank in the debtor's account. (Ginsburg Tr. Transcript. p. 20) When asked what his specific fear was about the overdraft situation, or why he felt he needed to make a loan of this magnitude to cover a customer's overdraft, his response was as follows:

> Because I wanted to continue on with the rating that the bank had with the regulatory bodies, which is A–2, and I know that with an overdraft like that, I am told that they wouldn't look kindly upon it, so I did it.

(Ginsburg Tr. Transcript, p. 20)

The opinion of the Plaintiff's expert banking witness, M.G. Sanchez, was that the "loan" transaction from the defendant to the debtor was definitely not in the ordinary course of business for a bank board chairman, such as this defendant. The expertise of his opinion was grounded in Mr. Sanchez's thirty years of banking experience, which included having been the former president and chief executive officer of a multi-bank holding company with nine banks and sixty-two banking offices, and assets of $1,500,000,000.00. (See Mr. Sanchez Resume, Plaintiff's Tr. Ex. 8) His opinion was further based on his review of a number of specific documents related to FCB, the debtor and the defendant in this action.

Among the factors enumerated by Mr. Sanchez as underlying his conclusion were the following:

— The debtor was a customer of FCB, with whom the defendant had no relationship otherwise.

— The $972,000.00 overdraft in the debtor's bank account constituted an

unsecured loan from the bank, which was approaching its legal lending limit to a single customer particularly as to unsecured debt.

— Bank directors may be held personally liable for money lost by their institutions under such circumstances.

— Had the overdraft not been corrected quickly, the FDIC would have subjected the bank to further scrutiny.

— The size of the debtor's overdraft in its bank account, at a bank of the small size of FCB, was highly unusual.

— The loan documentation was apparently executed after the fact.

— Minutes of the First Commercial Bank Loan Committee, of which the defendant was a member, discussing FCB loans to the debtor after the date of the Ginsburg stock purchase turned loan, never reveal any disclosure by the defendant to the loan committee of his personal involvement with this bank customer. (Plaintiff's Tr. Ex. 9)

The only witness whose testimony might tend to support the position that the $1,000,000.00 debt to defendant was incurred by the debtor in the ordinary course of the business or financial affairs of the debtor and defendant was attorney John Raymond. His testimony was that the debtor was looking for investors, and that he, John Raymond, as the attorney for the debtor, undertook to locate some investors. He found William and Raymond Nicholson, clients of his, who happened to be substantial shareholders of FCB, and Jordan Ginsburg, who happened to be chairman of the board of FCB. Mr. Raymond himself happened to be on the board of FCB. The timing of the $1,000,000.00 from the defendant and the $1,000,000.00 on the same date from the Messrs. Nicholson happened to be "coincidental" to the overdraft in the debtor's account at the bank on the same date, according to Mr. Raymond.

Interestingly, Mr. Raymond testified that he represented the defendant in this investment transaction (and the Nicholsons in their simultaneous investment transaction) and its later conversion to a loan. David Jones testified that he thought Mr. Raymond was representing him and his company, the debtor. The defendant did not think any attorney at all had represented him. It is uncontroverted, however, that as a result of the above transactions, Mr. Raymond received a $100,000.00 "finder's fee" for arranging these transfers to the debtor, which was paid by the debtor and that he became a member of the debtor's board of directors, assuming a direct role in running the debtor's company.

█ In looking to the note itself and the circumstances surrounding its inception, it can not be found that the defendant proved that the debt itself was incurred by the debtor in the ordinary course of both the debtor's and transferee's customary business and financial affairs, pursuant to § 547(c)(2)(A). Neither has the defendant proved that the interest obligations were incurred in the ordinary course. The defendant must also prove that the interest transfers that the debtor made to him were made in the ordinary course of both the debtor's and transferee's business and financial affairs. 11 U.S.C. § 547(c)(2)(B). This the defendant also failed to prove. As stated, the interest payments were irregular and often untimely. Mr. Ginsburg on occasion was required to call Mr. Jones concerning late interest payments. (Ginsburg Tr. Transcript, p. 3)

David Jones' deposition testimony established that once John Raymond became a member of the board of directors of the debtor, after the defendant and the Nicholsons became financially involved with the debtor, Mr. Raymond began directing the financial affairs of the debtor. Each month, he testified, Mr. Raymond would review the debtor's payables and choose, or *prefer*, which creditors to pay and which not to pay. Thereafter, checks would be cut, signed and sent out to the preferred creditors. The defendant was always on the list of preferred creditors and continued to be paid until shortly before the bankruptcy petition was filed, at which time almost no other creditors were being paid. (Jones 1/23/91 Deposition, Plaintiff's Tr. Ex. 2, pp. 15, 18, 57)

Thomas Tucker also testified that Mr. Raymond played some significant part in deciding who would be paid each month and in running the company financially.

Mr. Raymond himself admitted to playing an active management role in the debtor's financial affairs after becoming a member of the debtor's board of directors.

In view of the above testimony and evidence that in fact other creditors, including payroll tax claimants and many general unsecured creditors, were not being paid, the defendant has not carried the requisite burden of proof on the necessary element, § 547(c)(2)(B), by merely asserting that the interest payments were made pursuant to the terms of the promissory note (Plaintiff's Tr. Ex. 3), which called for monthly interest payments. In fact, most interest payments were not made in accordance with the note terms.

It is unnecessary to reach the last element of this defense, § 547(c)(2)(C), whether the transfers were made according to ordinary business terms. The defendant clearly has not met his burden of proof on the first two elements and all three elements must be proven. However, an investigation into "ordinary business terms" reveals that the defendant's failure to perfect a security interest in the stock pledged by David Jones as collateral for the loan or the defendant's total lack of investigation into the financial condition of the debtor prior to his transfer of $1,000,000.00 to it do not comport with the "ordinary business terms" which would normally be a part of monetary transactions of this magnitude between a lender and borrower who were strangers to one another and who were dealing at arms length with each other. In addition, the promissory note was backdated (Plaintiff's Tr. Ex. 3), and the defendant's position as a shareholder was backdated in the debtor's 1988 tax return to a time prior to the defendant's having transferred any money to the debtor and prior to his having made any commitment to doing so. Finally, looking again merely to the interest payments, it can not be said that they were made according to "ordinary business terms." There was no proof that late payments to a preferred creditor would meet this standard.

The Court may look beyond and behind the superficial, to the actions and intentions of the parties which were actually taking place at the time the debt and subsequent transfers took place.

CONCLUSION

Based on all of the foregoing, this Court finds in favor of the plaintiff Trustee who has proven by a preponderance of the evidence each element of a preference required by 11 U.S.C. § 547(b), as to each of the interest payments except the January 9, 1989 payment of $11,250.00 and the May 8, 1989 payment of $12,083.33, which were not payments on an antecedent debt. The defendant has had the use of money which he, as an unsecured creditor, was not entitled to receive. The Court concludes that it is equitable for the Trustee to receive interest on the total preferential transfers of $91,666.32 from the date of filing of the Trustee's complaint in this proceeding on December 17, 1990. *See, e.g., In re Southern Industrial Banking Corp.*, 87 B.R. 518, 522 (Bankr.M.D.Tenn.1988). This Judge, sitting by assignment, heard this adversary proceeding for Chief Judge Sidney M. Weaver; therefore, this Court will follow Judge Weaver's precedent in allowing prejudgment interest from December 17, 1990, through the date of entry of the judgment at the legal rate in Florida of 12%. Post judgment interest shall accrue pursuant to 28 U.S.C. § 1961 at the current federal rate. *In re Gillett*, 55 B.R. 675, 680 (Bankr.S.D.Fla.1985). The Court further finds that the defendant has not proven the requisite elements of an exception defense under either §§ 547(c)(1) or (c)(2). The Court further finds that the appropriate reach back period for purposes of this proceeding is one year, rather than 90 days, prior to the filing of the debtor's petition.

A separate final judgment of even date herewith will be entered in conformity with these findings and conclusions of law.

SO ORDERED.