In re VALLEY STEEL PRODUCTS
COMPANY, INC., et al.,
Debtors.

The OFFICIAL PLAN COMMITTEE ON
BEHALF OF the ESTATE OF VAL-
LEY STEEL PRODUCTS COMPANY,
INC., et al., Plaintiffs,

v.

WHITEWOOD TRANSPORTATION
INC., Defendant.

Bankruptcy No. 92–40778–293.
Adv. No. 93–4176–293.

United States Bankruptcy Court,
E.D. Missouri
Eastern Division.

Oct. 29, 1993.

Teresa A. Generous, St. Louis, MO, for plaintiffs.

John E. Hilton, Clayton, MO, for defendant.

### MEMORANDUM OPINION

DAVID P. McDONALD, Bankruptcy Judge.

### JURISDICTION

This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151, and 157 and Local Rule 29 of the United States District Court for the Eastern District of Missouri. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(F), which the Court may hear and determine.

### PROCEDURAL BACKGROUND

(1) On or about February 4, 1992, the affiliated entities of Valley Steel Products Company, Inc., Valley Industries, Inc., Valley Steel Products Company Transportation, Inc., Valley Steel Products Company Redevelopment Corp. and Performance Pipe and Steel, Inc. (the affiliated Valley Steel companies) filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

(2) On February 5, 1992, the Office of the United States Trustee appointed the Official Unsecured Creditors' Committee in the Valley Steel Products Company, Inc. case.

(3) This Court entered an order, on March 11, 1993, consolidating the bankruptcy proceedings of the affiliated Valley Steel companies.

(4) The Court confirmed a plan of reorganization on March 8, 1993. The plan of reorganization provided that the Committee had standing to prosecute Chapter 5 causes of action on behalf of the consolidated estate of the affiliated Valley Steel companies.

(5) The Official Plan Committee (Committee) filed an adversary Complaint on April 15, 1993 seeking to avoid and recover from Whitewood Transportation, Inc., (Whitewood) alleged preferential transfers totalling $3,566.00.[1] The challenged payments originated with Quality Pipe (Quality or Debtor) a business alias of Valley Steel Products Transportation Company.

(6) Whitewood filed an Answer to the Committee's Complaint asserting, as an affirmative defense, that the allegedly preferential transfers were payments in the ordinary course of the Quality's business.

(7) The Committee filed a Motion For Summary Judgement of this matter supported by a legal memorandum and affidavit testimony. Whitewood filed a Response and Memorandum in Opposition to Plaintiff's Motion For Summary Judgement, also supported with affidavit testimony, in which it expressed its argument against the granting of summary judgement in favor of the Committee and asked the Court to enter an order granting summary judgement in its favor.

### FACTUAL BACKGROUND

(1) On July 29, 1991, Quality and Whitewood entered into a contract that obligated Whitewood to deliver four separate shipments of pipe to an agreed upon site. On that same day, Whitewood issued four invoices to Quality, each invoice representing the amount owed for a different shipment to be made under the July 29, 1991 contract. The invoices all contained the payment term "net 15, 1.75% after 30."[2]

---

1. The Committee initially challenged two payment from Quality to Whitewood but later dropped its challenge to a payment made on December 24, 1991.

2. Regulations promulgated by the Interstate Commerce Commission (I.C.C.) require payment within seven days of an invoice. The invoices Whitewood issued to Quality also contained mention of this regulation.

The Debtor made payment on each of these four invoices on a different date. Quality paid one of the four invoices issued on July 29, 1991 on each of the following dates: September 11, 1991, September 16, 1991, September 19, 1991, and September 23, 1991. In other words, Quality paid the first invoice 44 days after its issuance and the fourth invoice 56 days after its issuance. Whitewood did not impose a penalty upon the Debtor or refuse to accept Quality's late-tendered payments.

(2) On September 12, 1991, Whitewood contracted to transport two shipments of pipe for Quality. The next day Whitewood issued two invoices to Quality, one for each of the shipments contemplated by the September 12, 1991 contract. These invoices made reference to I.C.C. regulations requiring payment within seven days and, like the July 29, 1991 invoices, contained terms requiring payment "net 15, 1.75% after 30." The Debtor paid the $2,916.00 due under these invoices with one check on November 25, 1991, 73 days after their issuance. As with the four prior late payments, Whitewood did not impose a penalty upon the Debtor or refuse to accept the untimely payments.

(3) On November 11, 1991, Quality hired Whitewood to transport one load of pipe. Whitewood issued an invoice for this transaction on November 13, 1991. Quality paid this invoice on December 24, 1991, 41 days after Whitewood issued it invoice. Again, Whitewood accepted the late payment without charging Quality a penalty.

(4) To support its motion for summary judgement, the Committee filed with the Court the affidavit of Patrick J. Gilligan Jr., the Chief Financial Officer of the affiliated Valley Steel companies. Mr. Gilligan testified that:

(a) in the ninety days preceding the filing of their companies' bankruptcy petitions, the management of the affiliated Valley Steel Companies were selectively deciding which bills to pay; and

(b) in the ninety days preceding the filing of their companies' bankruptcy petitions, the management of the affiliated Valley Steel Companies lacked sufficient cash to pay all their debts and resorted to paying some creditors with raw or alloy inventory material.

(5) To support its Motion For Summary Judgement, Whitewood filed the affidavit of Donald L. Sand. Mr. Sand, Whitewood's Secretary and Treasurer and a 19–year veteran of the trucking industry testified via affidavit that:

(a) Quality Pipe regularly paid amounts it owed to Whitewood "at least 45 days" after Whitewood issued an invoice, despite invoice terms stating that payments were due "net 15, 1.75% after 30;"

(b) Whitewood did not pressure, threaten, coerce or make demand of Quality Pipe to pay it $2,916.00 on November 29, 1991;

(c) despite invoice terms and I.C.C. regulations to the contrary, payment delays of from 1 to 100 days "are acceptable" in the trucking industry; and

(d) Whitewood, like other trucking companies, regularly accepts late payments from customers and has some customers who "take as long as 92 days to pay invoices."

## DISCUSSION

■ The Eighth Circuit Court of Appeals in *Lovett v. St. Johnsbury Trucking,* 931 F.2d 494 (8th Cir.1991), confronted the issue of whether late payments on invoices could be payments in the ordinary course of business and so qualify, under section 547(c)(2) of the Bankruptcy Code, as exceptions to the trustee's avoidance powers.

The *Lovett* debtor, International Transportation Systems (International), was a "freight forwarder, consolidator and distributor" in the trucking business. 931 F.2d at 495. International and St. Johnsbury, a common carrier of freight, serviced different geographic areas. *Id.* A year and one half before International filed for bankruptcy protection, the two trucking concerns entered into a reciprocal agreement under which each would collect freight in its region for delivery in the other concern's region and then forward that freight to the second concern who would deliver it to the destination within the region it regularly serviced. *Id.*

Under International's agreement with St. Johnsbury, the parties were bound to pay one another a percentage of the amount the originating company collected from the shipping customer "on or before the 30th day after the shipment." *Id.* St. Johnsbury and the debtor operated under the agreement until International filed its bankruptcy petition. *Id.* Despite the language in the reciprocal agreement regarding the thirty-day payment term, International consistently paid St. Johnsbury for its services much more than thirty days after the date of the shipment. 931 F.2d at 496. In fact, during the year preceding the ninety-day preference period, International, on average, paid St. Johnsbury for its services sixty-two (62) days after the shipment date. *Id.*

During the ninety-day preference period, International paid St. Johnsbury for services St. Johnsbury had performed pursuant to the reciprocal agreement. 931 F.2d at 496. On average, the invoices paid during the preference period were fifty-two days old. 931 F.2d at 498. The trustee of International's estate challenged, as preferences, those payments International made to St. Johnsbury during the preference period for services rendered more than thirty days before the payment date.[3] *Id.* at 496. St. Johnsbury countered the trustee's preference action with the defense that International had made the payments in the ordinary course of its business which brought them, within the scope of Bankruptcy Code section 547(c)(2)'s exception to the trustee's avoiding powers.

The Bankruptcy Court held that the payments made during the preference period to St. Johnsbury for service rendered more than thirty days before payment were preferential transfers and that they did not qualify for the Code's ordinary course of business exception to the trustee's avoiding powers. The District Court affirmed the Bankruptcy Court's decision. The Eighth Circuit affirmed the lower courts' determination that International's payments to St. Johnsbury during the preference period for services rendered more than thirty days before pay-

ment were preferences. 931 F.2d at 497. However, the Circuit Court reversed the bankruptcy court's finding that the challenged late payments did not qualify as payments made in the ordinary course of business. *Id.*

The Eighth Circuit reasoned that late payments can be payments in the ordinary course of business for purposes of section 547(c)(2)'s exception to the trustee's avoiding powers when the creditor defending against the trustee's avoidable preference allegation shows that the late payments were consistent with how the parties had previously conducted their business. *Id.* at 497. The Circuit noted that the determination of whether a late payment is within the ordinary course of business of two parties is "peculiarly factual." 931 F.2d at 497 (quoting *In re Fulghum Construction Corp.*, 872 F.2d 739, 743 (6th Cir.1989)). The Court emphasized that to prevail on theory a late payment was in the ordinary course of business and so beyond the scope of the trustee's avoiding powers, a "creditor must demonstrate some consistency with other business transactions between the debtor and the creditor." 931 F.2d at 497 (citation omitted).

Applying the law to the evidence St. Johnsbury presented, the Eighth Circuit concluded that St. Johnsbury had proven that the payments International made to it during the preference period, though late under the terms of the written agreement between St. Johnsbury and the debtor, were payments in the ordinary course of business between the parties. St. Johnsbury had entered into evidence records of payments International had made to St. Johnsbury over the year preceeding the preference period and records showing the debtor's payments to St. Johnsbury during the preference period. *Id.* at 498. The Circuit Court compared the two payment schedules and recognized that late payment on invoices issued under the reciprocal agreement was the standard practice between the parties. *Id.* The Court found that in both the year before the preference period and in the preference period, St.

---

**3.** The trustee also sued St. Johnsbury to collect those of the debtor's accounts receivable representing charges for services International had

performed for St. Johnsbury under the reciprocal agreement. 931 F.2d at 496.

Johnsbury had shown that International paid the "bulk of the invoices" evidencing sums owed to St. Johnsbury only after "substantial and significant delays." *Id.* The Eighth Circuit held this fact to "be dispositive" of whether the late payments were in the ordinary course of business despite proof that during the preference period the International paid St. Johnsbury for its services, on average, about ten days sooner than it had done in the year preceding the preference period. *Id.*

■ Language in the Eighth Circuit's *Lovett* opinion suggests that the application of "economic pressure to obtain payment as soon as possible" could take a payment out of the ordinary course of business exception. 931 F.2d at 499 (citation omitted). The Circuit explained that St. Johnsbury's requests that International "accelerate its payments 'as much as possible'" did not amount to the economic pressure which would remove a payment from the ordinary course of business. *Id.*

Finally, the *Lovett* court examined whether a creditor seeking to prove that a payment qualifies as a payment in the ordinary course of business has to show a correlation between the debtor's payment history and the general payment practice in the industry. 931 F.2d 499. The Circuit Court did not decide whether the Code required St. Johnsbury to make such a showing but it held that "[t]o the extent, if any, that section (c)(2)(C) requires [such a] comparison ... St. Johnsbury, [by] introduc[ing the uncontroverted] testimony of two of its officials that it is "common" in the trucking industry—even when 30–day payment terms are required by contract—for payments [to be made after expiration of the thirty-day period]" had satisfied "whatever burden" it might have had on the issue. *Id.*

In the present case, the Court only has the payment of seven invoices with which to try to define the relationship between Whitewood and Quality. The Debtor paid four of the seven invoices Whitewood issued in times ranging from 41 to 56 days. Payment on the other two invoices, which the Committee challenges as a preference, occurred 73 days after Whitewood issued those invoices. Payment on the seventh invoice, which occurred after the allegedly preferential transfer, occurred 37 days after Whitewood issued it.

The Court believes Whitewood has proven that, as an ordinary course of business, Quality paid Whitewood's invoices in an untimely manner. The Court bases this conclusion on three circumstances. First, the six-payment record of payments between Quality and Whitewood demonstrates that the Debtor never paid in accordance with the terms of the invoices Whitewood issued and regularly paid the amounts it owed Whitewood long after the expiration of the 15–day payment period noted on each invoice. The evidence also shows that Whitewood did not penalize Quality for not paying within the 15–day payment period noted on each invoice. Second, David Sand's uncontroverted testimony indicates that payments as late as 100 days are normal in the trucking industry, despite invoice terms and I.C.C. regulations requiring earlier payment. Mr. Sand's testimony that Whiteside has many other customers who pay their invoices in an untimely manner provides a third ground upon which the Court bases its conclusion that late payment was part of the ordinary course of business between Whitewood and Quality.

■ The question of avoidability is not solved merely by establishing the existence of an ordinary course of late payments for the creditor must prove that the challenged transfer fits within or conforms to the ordinary course of late payment it established. In this case, the Debtor made the challenged payment 73 days after Whitewood issued the invoices the payment sought to pay. The other five payments Quality made to Whitewood occurred between 37 and 56 days after the issuance of the invoices they sought to pay. In *The Official Plan Committee On Behalf of The Estate of Valley Steel Products Company, Inc. v. Zamzow Manufacturing, Inc.,* 166 B.R. 1001 (Bankr.E.D.Mo.1993), also issued this day, we found that a late payment which occurred fourteen days later

than any other late payment the debtor had made to the defending creditor did not significantly deviate from the established pattern of late payment and qualified for section 547(c)(2)'s exception to the trustee's [4] avoiding powers.[5] The Court holds that the seventeen-day difference between the delay in the payment of the challenged payment and the next-longest delay in the debtor's payment history is not significant.[6] The Court further holds that Quality's payment on November 25, 1991 of an invoice Whitewood issued 73 days earlier was within the ordinary course of business between Quality and Whitewood.

The Committee directs this Court to the recent decision of Judge Barta in *Riske v. C.T.S. Systems, Inc.* (*In re Keller Tool Corp.*), 151 B.R. 912 (Bankr.E.D.Mo.1993), for the proposition that *Lovett* should not be read in its "broadest sense and that consistent dealings based upon some business terms are required." Plaintiff's Memorandum In Support Of Motion For Summary Judgement at 9. The Court reads *In re Keller Tool Corp.* differently.

The parties in that case had no dealings with one another before the transfer that the trustee challenged as a preference. 151 B.R. at 914. Judge Barta did not comment on how broadly a court should read *Lovett.* He reasoned that the "key" to determining whether a defendant has established that the debtor made a challenged transfer in the ordinary course of business is "the relationship and nature of the dealings between the Debtor and the Defendant." *Id.* Because the parties in *In re Keller Tool Corp.* had never dealt with one another before, Judge

Barta looked to the written agreement between the defendant and the debtor to define their relationship. *Id.* After finding that the written agreement between the defendant and the debtor "clearly and unequivocally requires payment of the balance due 'net thirty days'," the Court concluded that the late payments were not in the ordinary course of business. *Id.* This Court does not read *In re Keller Tool Corp.* as limiting *Lovett*'s breadth and believes that today's holding is entirely consistent with both *In re Keller Tool Corp.* and *Lovett.*

An Order consistent with this Memorandum Opinion will be entered this date.

### ORDER

For the reasons set forth in the Memorandum Opinion filed this date, it is

ORDERED THAT

(1) Defendant's Motion For Summary Judgment is GRANTED; and

(2) Plaintiff's Motion For Summary Judgment is DENIED.

---

4. As in this case, the Official Plan Committee was exercising the trustee's avoiding powers pursuant to the confirmed plan of reorganization.

5. Zamzow Manufacturing, Inc. had a twenty-year history of dealing with its debtor and rather easily proved that late payment was the ordinary course of business between them. In this case, the parties dealt with one another five times, excluding those transfers the Committee now challenges. Gleaning a pattern of late payment from five instances of late payment may be testing the limits of *Lovett*'s holding but as the Court has indicated above, Whitewood has convinced the Court that Quality's late payment of its invoices was the ordinary course of business between them.

6. In so holding, the Court is mindful of the Eighth Circuit's instruction that a court's analysis of whether a given payment is within the ordinary course of business is "peculiarly factual." *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir.1991) (citation omitted), and does not today establish a rule that 14 days or 17 days is not a significant deviation from a debtor's proven payment pattern.