In re VALLEY STEEL PRODUCTS
COMPANY, INC., et al.,
Debtors.

The OFFICIAL PLAN COMMITTEE ON
BEHALF OF the ESTATE OF VAL-
LEY STEEL PRODUCTS COMPANY,
INC., et al., Plaintiffs,

v.

ZAMZOW MANUFACTURING
CO., INC., Defendant.

Bankruptcy No. 92–40778–293.
Adv. No. 93–4179–293.

United States Bankruptcy Court,
E.D. Missouri,
Eastern Division.

Oct. 29, 1993.

Teresa A. Generous, St. Louis, MO, for
plaintiffs.

John E. Hilton, Clayton, MO, for defen-
dant.

## MEMORANDUM OPINION

DAVID P. McDONALD, Bankruptcy
Judge.

### JURISDICTION

This Court has jurisdiction over the parties
and subject matter of this proceeding pursu-
ant to 28 U.S.C. §§ 1334, 151, and 157 and
Local Rule 29 of the United States District
Court for the Eastern District of Missouri.
This is a "core proceeding" pursuant to 28
U.S.C. § 157(b)(2)(F), which the Court may
hear and determine.

### PROCEDURAL BACKGROUND

(1) On or about February 4, 1992, the
affiliated entities of Valley Steel Products
Company, Inc., Valley Industries, Inc., Valley
Steel Products Company Transportation,
Inc., Valley Steel Products Company Rede-
velopment Corp. and Performance Pipe and
Steel, Inc. (the affiliated Valley Steel compa-
nies) filed voluntary petitions for relief under
Chapter 11 of the Bankruptcy Code.

(2) On February 5, 1992, the Office of the
United States Trustee appointed the Official
Unsecured Creditors' Committee in the Val-
ley Steel Products Company, Inc. case.

(3) This Court entered an order, on March
11, 1993, consolidating the bankruptcy pro-
ceedings of the affiliated Valley Steel compa-
nies.

(4) The Court confirmed a plan of reorga-
nization on March 8, 1993, which provided
that the Committee had standing to prose-
cute Chapter 5 causes of action on behalf of
the consolidated estate of the affiliated Valley
Steel companies. The Official Plan Commit-

tee (Committee) filed an adversary Complaint on April 15, 1993, seeking to avoid as preferences two transfers the Debtor made to Zamzow Manufacturing, Inc. (Zamzow) in the ninety days immediately preceding the filing of its bankruptcy petition. On July 27, 1993, Zamzow answered the Committee's Complaint.

(5) After the Committee filed a motion for summary judgement, Zamzow amended its answer to assert the defense that the payments the Debtor made, the allegedly preferential transfers, were in the ordinary course of its business with Zamzow.

(6) Zamzow filed a motion to enforce a settlement of this matter.[1] Counsel for Zamzow has indicated to the Court that he does not wish to pursue this enforcement motion.

(7) The Parties determined that they essentially agree upon the facts pertinent to the resolution of this matter and submitted the case to the Court on cross motions for summary judgement. The legal issue the Court must decide is whether the allegedly preferential transfers from the Debtor to Zamzow qualify for the ordinary course of business exception to avoidance of preferences provided in section 547(c)(2) of the Bankruptcy Code.

### FACTUAL BACKGROUND

Upon a review and consideration of the record filed in this case, the Court finds:

(1) On November 13, 1991, the Valley Steel Products Company Transportation, Inc. (Debtor or Transport), transferred a check written for $1,061.60 to Zamzow to pay for cargo control materials. The invoice evidencing the sale of the cargo control materials from Zamzow to the Debtor contained the date September 23, 1991 and specified that the terms of the sale were "net 30" (i.e. the entire price owed under the invoice was due thirty days from the invoice's date).

(2) On January 21, 1992, the Debtor transferred a check written for $4,322.50 to Zamzow. This check also paid an invoice evidencing the sale of cargo control materials from Zamzow to the Debtor. That invoice

contained the date November 5, 1991 and, like the September 23, 1991 invoice, specified that the terms of the sale were "net 30."

(3) In the period from November 1989 to May of 1991, Transport received nine invoices from Zamzow. Each of these invoices called for payment within thirty days but Debtor did not pay any of them on time. Instead, Transport paid these invoices between 43 and 63 days late.

(4) To support its motion for summary judgement, the Committee filed with the Court the affidavit of Patrick J. Gilligan Jr., the Chief Financial Officer of the affiliated Valley Steel companies. Mr. Gilligan testified that:

(a) in the ninety days preceding the filing of their companies' bankruptcy petitions, the management of the affiliated Valley Steel Companies were selectively deciding which bills to pay; and

(b) in the ninety days preceding the filing of their companies' bankruptcy petitions, the management of the affiliated Valley Steel Companies lacked sufficient cash to pay all their debts and resorted to paying some creditors with raw or alloy inventory material.

(5) In support of its motion for summary judgement, Zamzow filed with the Court the affidavit of its president, Ellis Schmidt. In his affidavit Mr. Schmidt swore that:

(a) Zamzow and the Debtor had transacted business with one another since the early 1970s;

(b) the course of the companies' twenty-year relationship, Transport had consistently been delinquent, at least 45 to 60 days late, in paying the amounts it owed to Zamzow, despite the "net 30" language on the invoices Zamzow issued throughout that period;

(c) Zamzow did not employ any unusual or extraordinary means to try to collect the amounts due under the invoices now claimed to have been preferential transfers; and

---

**1.** Zamzow alleged that it accepted an offer to settle this case before the Committee's withdrew

that offer.

(d) customers of cargo control materials customarily pay their invoices late and that approximately 25% of Zamzow's clientele have payment histories similar to Transport's.

## DISCUSSION

The Eighth Circuit Court of Appeals in *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494 (8th Cir.1991), confronted the issue of whether late payments on invoices can be payments in the ordinary course of business and so qualify, under section 547(c)(2) of the Bankruptcy Code, as exceptions to the trustee's avoidance powers.[2]

The *Lovett* debtor, International Transportation Systems (International), was a "freight forwarder, consolidator and distributor" in the trucking business. 931 F.2d at 495. International and St. Johnsbury, a common carrier of freight, serviced different geographic areas. *Id.* A year and one half before International filed for bankruptcy protection, the two trucking concerns entered into a reciprocal agreement under which each would collect freight in its region for delivery in the other's region and then forward that freight to the second concern who would deliver it to the destination within the region it regularly serviced. *Id.*

International's agreement with St. Johnsbury obligated the freight-forwarding party to pay the freight-receiving party a percentage of the amount the freight-forwarding company collected from the shipping customer "on or before the 30th day after the shipment." *Id.* St. Johnsbury and the debtor operated under the agreement until International filed its bankruptcy petition. *Id.* Despite the language in the reciprocal agreement requiring payment within thirty days, International consistently paid St. Johnsbury for its services much more than thirty days after the date of the shipment. 931 F.2d at 496. In fact, during the year preceding the ninety-day preference period, International, on average, paid St. Johnsbury for its servic-

es sixty-two (62) days after the shipment date. *Id.*

During the ninety-day preference period, International paid St. Johnsbury for services St. Johnsbury had performed pursuant to the reciprocal agreement. 931 F.2d at 496. On average, the invoices paid during the preference period were fifty-two days old. 931 F.2d at 498. The trustee of International's estate challenged, as preferences, those payments International made to St. Johnsbury during the preference period for services rendered more than thirty days before the payment date.[3] *Id.* at 496. St. Johnsbury countered the trustee's preference action with the defense that International had made the payments in the ordinary course of its business which brought those payments within the scope of Bankruptcy Code section 547(c)(2)'s exception to the trustee's avoiding powers.

The Bankruptcy Court held that the payments made during the preference period to St. Johnsbury for service rendered more than thirty days before payment were preferential transfers and that they did not qualify for the Code's ordinary course of business exception to the trustee's avoiding powers. The District Court affirmed the Bankruptcy Court's decision. The Eighth Circuit affirmed the lower courts' determination that International's payments to St. Johnsbury during the preference period for services rendered more than thirty days before payment were preferences. 931 F.2d at 497. However, the Circuit Court reversed the bankruptcy court's finding that the challenged late payments did not qualify as payments made in the ordinary course of business. *Id.*

The Eighth Circuit reasoned that late payments can be payments in the ordinary course of business when the creditor trying to establish the exception to the trustee's avoiding powers shows that the late payments were consistent with how the parties had previously conducted their business. *Id.*

---

**2.** As is noted above, the plan of reorganization vested the Committee with the power to pursue Chapter 5 claims on the estate's behalf.

**3.** The trustee also sued St. Johnsbury to collect those of the debtor's accounts receivable representing charges for services International had performed for St. Johnsbury under the reciprocal agreement. 931 F.2d at 496.

at 497. The Circuit noted that the determination of whether a late payment is within the ordinary course of business of two parties is "peculiarly factual." 931 F.2d at 497 (quoting *In re Fulghum Construction Corp.*, 872 F.2d 739, 743 (6th Cir.1989)). The Court emphasized that to prevail on the theory that a late payment was in the ordinary course of business and so beyond the scope of the trustee's avoiding powers, a "creditor must demonstrate some consistency with other business transactions between the debtor and the creditor." 931 F.2d at 497 (citation omitted).

Applying the law to the evidence St. Johnsbury presented, the Eighth Circuit concluded that St. Johnsbury had proven that the payments International made to it during the preference period, though late under the terms of the reciprocal agreement, were payments in the ordinary course of business between the parties. St. Johnsbury had entered into evidence records of payments International had made to St. Johnsbury over the year preceding the preference period and records showing the debtor's payments to St. Johnsbury during the preference period. *Id.* at 498. The Circuit Court compared the two payment schedules and recognized that late payment on invoices issued under the reciprocal agreement was the standard practice between the parties. *Id.* The Court found that in both the year before the preference period and in the preference period, St. Johnsbury's evidence showed that International paid the "bulk of the invoices" evidencing sums owed to St. Johnsbury only after "substantial and significant delays." *Id.* The Eighth Circuit held this fact to "be dispositive" of whether the late payments were in the ordinary course of business, despite proof that during the preference period International paid St. Johnsbury for its services, on average, about ten days sooner than it had done in the year preceding the preference period. *Id.*

Language in the Eighth Circuit's *Lovett* opinion suggests that the application of "economic pressure to obtain payment as soon as possible" could take a payment out of the ordinary course of business exception. 931 F.2d at 499 (citation omitted). The Circuit explained that St. Johnsbury's requests that International "accelerate its payments 'as much as possible'" did not amount to the economic pressure which would remove a payment from the ordinary course of business. *Id.*

Finally, the *Lovett* court examined whether a creditor seeking to prove that a payment qualifies as a payment in the ordinary course of business has to show a correlation between the debtor's payment history and the general payment practice in the industry. 931 F.2d at 499. The Circuit Court did not decide whether the Code required St. Johnsbury to make such a showing but it held that "[t]o the extent, if any, that section (c)(2)(C) requires [such a] comparison ... St. Johnsbury, [by] introduc[ing the uncontroverted] testimony of two of its officials that it is 'common' in the trucking industry—even when 30–day payment terms are required by contract—for payments [to be made after expiration of the thirty-day period]" had satisfied "whatever burden" it might have had on the issue. *Id.*

In the present case, the Committee challenges the untimely payment of two invoices as preferential transfers. One payment the Committee alleges is an avoidable preference is the Debtor's payment of an invoice made 51 days after the date of sale. The second challenged transfer occurred when Transport paid Zamzow 77 days after Zamzow issued an invoice containing the payment term "net 30". While the undisputed facts demonstrate that these transfers were preferences,[4] they also prove that the challenged payments were made in the ordinary course of business and as such are not avoidable transfers under section 547(c)(2) of the Bankruptcy Code.

The parties submitted a chart summarizing nine transactions between the parties in 1989, 1990 and 1991. This chart showed the date of each invoice the Defendant issued to the Debtor, the invoice's stated payment date, and the date that the Debtor actually

**4.** The parties agree that the only issue in this case is whether the Debtor made these transfers in the ordinary course of business. The Court will not, therefore, recite why these transfers constitute preferences.

paid the invoice. Though all the invoices called for payment thirty days from their issuance, the Debtor paid them, on average 51 days after their issuance with the soonest payment occurring 43 days after the invoice's issuance and the latest delay occurring 65 days after the invoice's issuance.

The Committee insists that this sample is too small to establish a course of conduct and tries to distinguish this case from *Lovett* on the basis that in *Lovett* the debtor had a payment record documented by 259 checks. The Court is not persuaded by the Committee's argument. The record of payments submitted in this case may only consist of nine transactions but that record spans nearly three years of time. Additionally, the Court has before it the uncontroverted testimony of Zamzow's president indicating that the nine transaction record submitted to the Court fairly represents the Debtor's entire history of payments to the Defendant dating back to the 1970's.

Having established a course of dealing between the parties the Court must now determine whether the late payments now challenged as preferential transfers fall within the parties' ordinary course of dealing. Clearly, the payment made on November 13, 1991 qualifies as a payment made in the ordinary course of Transport's business. With this payment the Debtor sought to pay the amount owed on an invoice Zamzow issued 51 days earlier. This delay, 51 days, was within the range of delay (43 days to 65 days) established by the nine-transaction sample and, in fact, equalled the average delay established by the sample data. This payment conformed to the established course of business between Transport and Zamzow.

The Committee argues that the Debtor's payment of a second invoice with "net 30" terms 77 days after its issuance cannot qualify as a payment made in the ordinary course of business. True, the 77-day delay exceeds the longest previous delay in payment between the parties. However, that fact is not determinative of the issue. In the *Lovett* case, the Eighth Circuit stated that a ten-day decrease in the average delay before payment "was not sufficiently significant to show that the payments during the 90-day period did not follow the ordinary course of business reflected in the prior 12-month period." 931 F.2d at 498. Instead, the Court commented that "[i]n both periods [the year before the preference period and the preference period], there were substantial and significant delays in paying the bulk of the invoices." *Id.* Similarly, the 77-day delay in this case exceeded by only 12 days the range of prior delays in payments between Transport and Zamzow. This added delay is not "sufficiently significant" to remove the payment from the scope of the parties' ordinary course of business.

The Committee directs this Court to the recent decision of Judge Barta in *Riske v. C.T.S. Systems, Inc. (In re Keller Tool Corp.)*, 151 B.R. 912 (Bankr.E.D.Mo.1993), for the proposition that *Lovett* should not be read in its "broadest sense and that consistent dealings based upon some business terms are required." Plaintiff's Memorandum In Support Of Motion For Summary Judgement at 9. The Court reads *In re Keller Tool Corp.* differently.

The parties in that case had no dealings with one another before the transfer that the trustee challenged as a preference. 151 B.R. at 914. Judge Barta did not comment on how broadly a court should read *Lovett*. He reasoned that the "key" to determining whether a defendant has established that the debtor made a challenged transfer in the ordinary course of business is "the relationship and nature of the dealings between the Debtor and the Defendant." *Id.* Because the parties in *In re Keller Tool Corp.* had never dealt with one another before, Judge Barta looked to the written agreement between the defendant and the debtor to define their relationship. *Id.* After finding that the written agreement between the defendant and the debtor "clearly and unequivocally requires payment of the balance due 'net thirty days'," the Court concluded that the late payments were not in the ordinary course of business. *Id.* This Court does not read *In re Keller Tool Corp.* as limiting *Lovett*'s breadth and believes that today's holding is entirely consistent with both *In re Keller Tool Corp.* and *Lovett*.

An Order consistent with this Memorandum Opinion will be entered this date.

### ORDER

For the reasons set forth in the Memorandum Opinion filed this date, it is

ORDERED THAT

(1) Defendant's Motion For Summary Judgment is GRANTED; and

(2) Plaintiff's Motion For Summary Judgment is DENIED.