In re LEWELLYN & CO., INC., and Gary Vance Lewellyn, Debtors.

Paul R. TYLER, Trustee, Appellant,

v.

SWISS AMERICAN SECURITIES, INC., Appellee.

No. 89–2952.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 13, 1990.

Decided April 1, 1991.

Brent R. Appel, Des Moines, Iowa, for appellant.

Matthew Gluck, New York City, for appellee.

Before JOHN R. GIBSON, Circuit Judge, and HEANEY, Senior Circuit Judge, and LARSON,* District Judge.

HEANEY, Senior Circuit Judge.

Paul R. Tyler, trustee for the consolidated bankruptcy estates of Gary Lewellyn and G.V. Lewellyn & Co. (GVL), appeals from the district court's affirmance of the bankruptcy court's finding that a transfer of stock by Lewellyn to Swiss American Securities, Inc. (SASI) was a non-avoidable preference under 11 U.S.C. § 547(c). We affirm.

## BACKGROUND

GVL was a securities brokerage firm incorporated in 1980 in Des Moines, Iowa. In June 1981, Gary Lewellyn, president and sole shareholder of GVL, entered into an agreement for securities clearing services with SASI, a securities broker-dealer. SASI agreed to provide clearing services for GVL and the accounts of its customers.[1] Under the agreement, GVL promised to comply with Federal Reserve Board Regulation T[2] and other applicable law, gave SASI complete discretion over extensions of credit, and gave SASI a general lien on all cash, securities, and other property in the accounts of GVL and its customers. Lewellyn also opened cash and margin trading accounts in his own name with SASI under the same conditions.

In late 1981, Lewellyn used his personal account to make large margin purchases of shares of highly speculative stock in a company called Safeguard Scientifics, Inc. (Safeguard). In November 1981, concerned about the level of Lewellyn's purchases of Safeguard, SASI increased the maintenance requirement in Lewellyn's margin account from 35% to 50%. Lewellyn continued to buy Safeguard on margin, and in December 1981, SASI required that he make any further Safeguard purchases on a cash basis. Lewellyn continued to purchase Safeguard through his cash account, and on margin through three accounts he opened with SASI in the names of purported customers who were actually Lewellyn's girlfriend and two relatives. For the next two months, Lewellyn settled all his cash purchases, which amounted to millions of dollars in Safeguard stock, within the seven business days required by Regulation T.

In February 1982, Lewellyn withdrew from his cash account 425,000 shares of Safeguard for which he had fully paid. On March 1, 1982, SASI reviewed Lewellyn's accounts and discovered that the debit balances of Lewellyn and his customers equaled half of SASI's capital. SASI informed Lewellyn that his customers could no longer buy on margin Safeguard or another stock in which Lewellyn traded heavily. Lewellyn requested a meeting with SASI management, which was held on March 4, 1982.

At the meeting, Lewellyn told SASI officials that he had a temporary cash flow problem, and would be unable to settle approximately $8 million in cash stock purchases he had made in the preceding seven business days. He offered SASI the 425,-000 shares of Safeguard he had earlier withdrawn from his cash account as collat-

---

* The Honorable Earl R. Larson, United States District Judge for the District of Minnesota, sitting by designation.

1. Clearing services included: execution of orders for the purchase and sale of securities; clearance and settlement of contracts and transactions in securities; and preparation and delivery of confirmations evidencing the purchase or sale of securities, monthly statements of account, and similar records. *Tyler v. Swiss American Securities, Inc. (In re G.V. Lewellyn & Co. and Gary Vance Lewellyn)*, Nos. 82–162–C

H, 82–766–C H, slip op. at 3 (Bankr.S.D. Iowa Apr. 13, 1989).

2. Regulation T governs extensions of credit by and to securities brokers and dealers. It imposes, among other obligations, initial margin requirements and payment rules on securities transactions. 12 C.F.R. § 220.1(a) (1990). Under Regulation T, a customer purchasing securities on a cash basis must make the full cash payment within seven business days of the execution of the purchase. 12 C.F.R. § 220.8(b) (1990).

eral for his cash obligation. SASI accepted the shares and placed them in Lewellyn's margin account. SASI also transferred all Safeguard shares remaining in Lewellyn's cash account to his margin account. On March 16, SASI informed Lewellyn that it was terminating the margin accounts of Lewellyn and his customers, and that it would take legal action if the debit balances were not eliminated.

The price of Safeguard dropped from $14.50 to $11.00 per share on March 17. On March 18, the Securities and Exchange Commission (SEC) suspended trading in Safeguard for ten days and began an investigation of Lewellyn. The SEC discovered that Lewellyn's stock purchases had been financed by the embezzlement of $16,705,000 from the First National Bank of Humboldt, Iowa, where Lewellyn's father was president. The Securities Investor Protector Corporation commenced a bankruptcy proceeding by filing an application for relief against GVL under the Securities Investor Protection Act (SIPA), 15 U.S.C. §§ 78aaa–78lll (1988). The application was granted and a trustee appointed on April 15, 1982. Lewellyn filed a voluntary petition under Chapter 11 on May 24, 1982. The two proceedings were consolidated on October 29, 1982 because the assets and liabilities of Lewellyn and GVL were extensively commingled.

In March 1986, the trustee commenced this action to recover the value of the 425,000 shares of Safeguard that Lewellyn transferred to SASI on March 4, 1982. The trustee alleged that the transfer was an avoidable preference under 11 U.S.C. § 547(b) and a fraudulent conveyance under 11 U.S.C. § 548(a)(2)(A). The bankruptcy court granted summary judgment for SASI on the fraudulent conveyance claim and held a trial on the preference claim. The court held that the transfer was a preference under 11 U.S.C. § 547(b) because it was made to a creditor, on account of an antecedent debt, while the debtor was insolvent, within 90 days before the

filing of the petition, and it enabled the creditor to receive more than it would have in a Chapter 7 liquidation. The court held that the transfer was not an avoidable preference, however, because it was intended to be, and was, a contemporaneous exchange for new value given to the debtor under 11 U.S.C. § 547(c)(1). The court alternatively held that the transfer was a margin payment exempt from avoidance under 11 U.S.C. § 546(e). The district court affirmed the bankruptcy court's decision and the trustee appeals.

## DISCUSSION

On appeal, the trustee claims that Lewellyn's transfer of Safeguard stock to SASI in lieu of timely cash settlement of his $8 million obligation was not intended to be, and was not in fact, a contemporaneous exchange for new value. The trustee thus argues that SASI failed to sustain its contemporaneous exchange defense under section 547(c)(1).[3] Section 547(c) states:

The trustee may not avoid under this section a transfer—

(1) to the extent that such transfer was

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange[.]

11 U.S.C. § 547(c)(1) (1988). To establish its defense under section 547(c), SASI had to show that the parties intended the transfer of Safeguard shares to be a contemporaneous exchange for new value, that the exchange was in fact contemporaneous, and that the $8 million in cash stock purchases SASI made for Lewellyn constituted new value for the Safeguard shares. The existence of intent, contemporaneousness, and new value are questions of fact. *See Creditors' Committee v. Spada (In re*

---

**3.** The trustee also argues that the district court erred in applying the margin payment exception of section 546(e) to defeat the trustee's claim. Because we find that the transfer of the 425,000 shares was a contemporaneous exchange for new value, we need not address the trustee's second claim of error.

*Spada),* 903 F.2d 971, 975 (3d Cir.1990). We review the bankruptcy court's findings of fact as approved by the district court under the clearly erroneous standard. *See Jennen v. Hunter (In re Hunter),* 771 F.2d 1126, 1129 & n. 3 (8th Cir.1985); Bankr.R. 8013.

### I. *Contemporaneous Intent*

■ "The critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange." *In re Spada,* 903 F.2d at 975 (quoting *Matter of Prescott,* 805 F.2d 719, 727 (7th Cir.1986)). Under the clearing agreement between Lewellyn and SASI, all cash stock purchases were to be settled within the seven business days required by Regulation T. Lewellyn had previously settled all cash transactions within the seven-day period. In the two months preceding March 4, 1982, Lewellyn had made more than $3 million in prompt cash payments for stock purchases through his cash account. In the week preceding March 4, 1982, SASI had purchased $8 million worth of securities for Lewellyn through his cash account. Lewellyn was to settle these transactions by or shortly after March 4.

Both the agreement of the parties and their course of dealing suggest that they intended the transfer of 425,000 Safeguard shares to be a contemporaneous exchange in lieu of cash settlement for the most recent $8 million in purchases SASI made for Lewellyn through his cash account. These considerations are acceptable evidence of contemporaneous intent under section 547(c). *See Grogan v. Southwest Textiles, Inc. (In re Advance Glove Mfg. Co.),* 42 B.R. 489, 493 (Bankr.E.D.Mich. 1984) (agreement between parties can evidence contemporaneous intent); *Pfau v. First Nat'l Bank (In re Schmidt),* 26 B.R. 89, 91 (Bankr.D.Minn.1982) (course of dealing between parties can show contemporaneous intent). The bankruptcy court's finding of contemporaneous intent therefore is not clearly erroneous.

### II. *Contemporaneousness in Fact*

■ Section 547(c) also requires a transfer to be "in fact a substantially contemporaneous exchange" to constitute a non-avoidable preference. 11 U.S.C. § 547(c)(1)(B) (1988). The transfer of the 425,000 Safeguard shares occurred within seven business days of SASI's purchases of $8 million worth of stock through Lewellyn's cash account. Under Regulation T, $3,225,000 of these purchases was to come due on March 4, 1982, $2,500,000 would come due on March 5, 8, and 9, and $2,225,-000 would come due on March 10 and 11, 1982. This court previously has recognized the contemporaneous nature of securities transactions closed within the seven-day settlement period. *See Naftalin & Co. v. Merrill Lynch, Pierce, Fenner & Smith,* 469 F.2d 1166, 1179-80 (8th Cir.1972); *see also* 4 *Collier on Bankruptcy* ¶ 764.01[3] n. 9 (15th ed. 1987) (quoting legislative history to the effect that settlement payments made to a securities clearing organization are non-avoidable preferences because they constitute contemporaneous exchanges for new value under § 547(c)).

Courts also have looked to the agreement of the parties to determine whether an exchange is substantially contemporaneous in fact. *See Remes v. Acme Carton Corp. (In re Fasano/Harriss Pie Co.),* 43 B.R. 871, 876 (Bankr.W.D.Mich.1984), *aff'd,* 71 B.R. 287 (W.D.Mich.1987); *Advance Glove,* 42 B.R. at 493. The clearing agreement between SASI and Lewellyn incorporated Regulation T's seven-day settlement period for cash transactions, and the transfer of the 425,000 Safeguard shares did occur within seven business days of the $8 million in stock purchases. Under these circumstances, the bankruptcy court's finding that the exchange was substantially contemporaneous in fact is not clearly erroneous.

### III. *New Value*

■ The final element required to establish a non-avoidable preference is Lewellyn's receipt of new value for the 425,000 Safeguard shares. The agreement between the parties contemplated that stock

transactions through Lewellyn's cash account be settled within seven business days for cash, but section 547(c)(1) does not require that a contemporaneous exchange for new value involve the same type of consideration as that originally envisioned by the parties. Section 547 defines "new value" as "money or money's worth in goods, services, or new credit." 11 U.S.C. § 547(a)(2) (1988). Moreover, section 547(c)(1) applies whether the new value is given before or after the transfer by the debtor; the statute requires only that the exchange be "substantially" contemporaneous.

SASI extended $8 million worth of new credit to Lewellyn in the seven business days preceding the transfer of Safeguard shares. The 425,000 shares had a market value of $6.8 million on March 4, 1982. The clearing agreement gave SASI complete discretion to transfer money, securities, and other property between accounts. SASI had a right to accept the Safeguard shares in lieu of cash, and would not have executed the additional $8 million in stock purchases for Lewellyn had it not expected him to settle the transactions within seven business days as he always had. Under these circumstances, the bankruptcy court correctly found that Lewellyn received new value for the 425,000 shares in the form of $8 million in new credit from SASI.

## CONCLUSION

Accordingly, we affirm the judgment of the district court.