# United States Bankruptcy Appellate Panel

## FOR THE EIGHTH CIRCUIT

No. 97-6015EMSL

In re:                                    *
                                          *
GATEWAY PACIFIC CORP.                      *
                                          *
          Debtor                          *
                                          *
OFFICIAL PLAN COMMITTEE, ET AL.            *
                                          *  Appeal from the United
          Appellee                        *  States Bankruptcy Court
                                          *  for the Eastern District
     -v.-                                 *  of Missouri
                                          *
EXPEDITORS INTERNATIONAL OF                *
WASHINGTON, INC.                           *
                                          *
          Appellant                       *
                                          *

Submitted: October 9, 1997

Filed: December 5, 1997

Before KRESSEL, WILLIAM A. HILL, and DREHER, Bankruptcy Judges.

DREHER, Bankruptcy Judge

     This is an appeal from the bankruptcy court's[1] decision that certain

payments made by Gateway Pacific Corp. (Debtor) to

---

[1]    The Honorable Barry S. Schermer, United States Bankruptcy
Judge, Eastern District of Missouri.

1

Expeditors International of Washington, Inc. (Expeditors) were avoidable under § 547 of the Bankruptcy Code. The parties stipulated that the payments were preferential under Bankruptcy Code § 547(b). On appeal is the bankruptcy court's determination that Expeditors had not established either the contemporaneous exchange for new value or the ordinary course of business defenses under §§ 547(c)(1) or (c)(2), respectively.

## I.  FACTUAL BACKGROUND

Debtor was engaged in the business of selling tools under the name of Buffalo Tool. Although Debtor's business was located in St. Louis, Debtor imported most of its inventory from Asia. Debtor contracted with Expeditors to act as its freight forwarder and customs broker. Expeditors arranged for the shipping of Debtor's imports by finding a carrier and purchasing space on air and ship lines and it advanced custom duties for Debtor's imported shipments and secured their clearance through customs.

Debtor and Expeditors began doing business in the summer of 1993. On October 5, 1993, Debtor submitted a credit application to Expeditors. Expeditors approved the application and provided Debtor with a $25,000 line of credit, which was later increased to $60,000. The credit agreement provided that Debtor would make payment to Expeditors within fifteen days of the date of any

invoice. Paragraph 15 of the agreement further provided that, to the extent of sums due, Expeditors would have a "general lien on any and all property (and documents relating thereto) of the Customer [the Debtor], in its possession, custody or control or en route. . . ."

Expeditors generally made two to three shipments a week to Debtor. Expeditors' fees and charges were typically $2-3,000 per shipment. These shipments were always accompanied by an invoice which provided that payments for Expeditors' services were due within fifteen days of the date of the invoice. The invoices also included language similar to that found in Paragraph 15 of the Credit Agreement. Notwithstanding these provisions, Debtor almost never made payments on time and it regularly exceeded its credit limit. As with virtually all of its other customers who were slow in making payments, Expeditors regularly made telephone calls, usually weekly, to Debtor, asking for payment. However, Expeditors imposed no interest or late charges, started no collection actions, and made no threats to withhold goods. Although Debtor routinely paid the invoices late, it always paid each invoice in full. Expeditors viewed Debtor as a "[l]ate, but dependable" and "slow pay, but steady pay" customer. Eventually, a practice developed between the parties whereby Expeditors would release goods to

Debtor soon after payment of a prior invoice. The amount of the goods released by Expeditors generally exceeded the amount of Debtor's payment on the earlier invoice. There was no evidence that the parties had ever agreed to such a practice, nor discussed its implicit terms.

On August 31, 1995, Debtor filed a petition for relief under Chapter 11 of the United States Bankruptcy Code. At the time of filing, Debtor still owed Expeditors over $40,000, a sum Expeditors admits was unsecured. Pursuant to authority provided in the plan, the unsecured creditors' committee (Committee) filed this action against Expeditors seeking to avoid as preferences $96,797.30 that Debtor had paid to Expeditors during the ninety days prior to filing. In response, Expeditors asserted three defenses: contemporaneous exchange (§ 547(c)(1)); ordinary course of business (§ 547(c)(2)); and new value (§ 547(c)(4)). The parties stipulated that the Committee had made a showing that all payments were preferential under § 547(b) of the Bankruptcy Code and that Expeditors was the "initial transferee" under § 550(a); that $42,661.71 of that amount was protected from avoidance by the new value defense under § 547(c)(4); and, that, with respect to the ordinary course of business defense, the requirement of § 547(c)(2)(A) had been met. This left for trial the following two

questions: whether 1) twenty-eight payments made during the ninety days prior to filing amounting to $54,135.59[2] were made in the ordinary course of business or financial affairs of the parties and according to ordinary business terms under § 547(c)(2)(B) and (c)(2)(C), respectively; and, if not, whether 2) the payments were intended as, and were in fact, a contemporaneous exchange for new value under § 547(c)(1).

The bankruptcy court determined that Expeditors had satisfied its burden of proving that the payments were made according to ordinary business terms within the meaning of § 547(c)(2)(C). The bankruptcy court went on to hold, however, that twenty-four of the twenty-eight payments made to Expeditors within ninety days prior to the filing but more than fifty days after the date of invoice were not made in the ordinary course of business and financial dealings between the parties. It further held that Expeditors had failed to show that such payments to Expeditors were intended by *both* the Debtor and Expeditors to be a contemporaneous exchange for new value. Accordingly, the bankruptcy court entered judgment against Expeditors for $40,577.31. This figure represented twenty-

---

[2]    This figure represents the difference between the amount originally sought by the Committee ($96,797.30) and the amount the Committee subsequently conceded was protected from avoidance by the new value defense ($42,661.70).

four payments made by Debtor to Expeditors within the ninety days preceding bankruptcy on invoices which were more than fifty days old.

## II.  ISSUES PRESENTED

Expeditors makes two arguments on appeal.  First, it asserts that the bankruptcy court erred in finding that payments made on invoices which were more than fifty days old were not made in the ordinary course of business. Second, it asserts that the bankruptcy court erred in finding that Expeditors had failed to show that *both* Debtor and Expeditors intended the payments be made in contemporaneous exchange for a release by Expeditors of the lien which was referenced in the credit agreement.[3]

## III.  DISCUSSION

A.  STANDARD OF REVIEW

Whether payments are made in the ordinary course of business between the parties or intended as a contemporaneous exchange for new value are questions of fact.  Accordingly, the bankruptcy

---

[3]    The parties also briefed and argued the issue of whether the exchanges were contemporaneous and whether Expeditors actually had a lien on the goods in transit which could serve as "new value".  Because we uphold the bankruptcy court's finding that Expeditors failed to prove a mutual intention for its contemporaneous exchange for new value, we need not address these arguments.

court's factual findings on these two questions will not be reversed unless they are clearly erroneous. Jones v. United Savings and Loan Assoc. (In re U.S.A. Inns of Eureka Springs, Ark., Inc.), 9 F.3d 680, 682-83 (8th Cir. 1993); Lovett v. St. Johnsbury Trucking, 931 F.2d 494, 497 (8th Cir. 1991); Tyler v. Swiss Am. Securities, Inc. (In re Lewellyn & Co., Inc.), 929 F.2d 424, 427-28 (8th Cir. 1991). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer, 470 U.S. 564, 573 (1985) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)); Martin v. Cox (In re Martin), 212 B.R. 316, 319 (B.A.P. 8th Cir. 1997); Tri-County Credit Union v. Leuang (In re Leuang), 211 B.R. 908, 909 (B.A.P. 8th Cir. 1997); Bayer v. Hill (In re Bayer), 210 B.R. 794, 795 (B.A.P. 8th Cir. 1997). Under the clearly erroneous standard, a reviewing court may not reverse the trier of fact simply because it would have decided the case differently. Handeen v. LeMaire (In re LeMaire), 898 F.2d 1346, 1349 (8th Cir. 1990) (citing Anderson, 470 U.S. at 573). Indeed, "when there are two permissible views of the evidence, we may not hold that the choice made by the trier of fact was clearly erroneous." Id.

7

B.    SECTION 547(c)(2): ORDINARY COURSE OF BUSINESS

Section 547(c)(2) of the Bankruptcy Code renders unavoidable an otherwise preferential transfer:

> (2)   to the extent that such transfer was--
>        (A)   in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>        (B)   *made in the ordinary course of business or financial affairs of the debtor and the transferee;*
>        (C)   made according to ordinary business terms . . . .

11 U.S.C. § 547(c)(2) (1994) (emphasis added).  This provision is intended "to protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the debtor and the transferee." LAWRENCE P. KING ET AL., COLLIER ON BANKRUPTCY ¶ 547.04[2], at 547-47 (15th rev. ed. 1997).  See also S. REP. NO. 95-989, at 88 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5874; H.R. REP. NO. 95-545, at 373 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6329 ("The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the slide into bankruptcy.").  In order to fall within the protection of § 547(c)(2), a transferee must prove, by a preponderance of the evidence, that all three statutory elements of § 547(c)(2) are met.

11 U.S.C. § 547(g) (1994); <u>Eureka Springs</u>, 9 F.3d at 682. In this case, the parties stipulated to the existence of the first statutory element and there is no challenge to the bankruptcy court's finding on the third element. This leaves for decision only § 547(c)(2)(B), proof that the payments were made in the ordinary course of business or financial affairs of the parties.

Section 547(c)(2)(B) is the subjective component of the statute, requiring proof that the debt and its payment are ordinary in relation to other business dealings between the creditor and the debtor. <u>Eureka Springs</u>, 9 F.3d at 684 (citing <u>Logan v. Basic Distrib. Corp. (In re Fred Hawes Org., Inc.)</u>, 957 F.2d 239 (6th Cir. 1992)). "[T]he cornerstone of [§ 547(c)(2)(B)] is that the creditor needs [to] demonstrate some consistency with other business transactions between the debtor and the creditor." <u>Lovett</u>, 931 F.2d at 497. In reviewing the bankruptcy court's decision on this question, we must keep in mind that "there is no precise legal test which can be applied in determining whether payments by the debtor during the 90-day period were made in the ordinary course of business; rather, th[e] court must engage in a 'peculiarly factual' analysis." <u>Eureka Springs</u>, 9 F.3d at 682-83 (quoting <u>Lovett</u>, 931 F.3d at 497 (quoting <u>In re Fulghum Constr. Corp.</u>, 872 F.2d 739, 743 (6th Cir. 1989))).

In this case, the parties agreed to use the nine months preceding the preference period to establish the ordinary course of business between them. Stipulated evidence demonstrated that, during the nine months preceding the preference period, the median time elapsed between the date of invoice and the date of payment was thirty-five days; during the preference period, however, this number increased to fifty-four days. The court noted that this was an increase of fifty-four percent, rendering the payments made during the preference period significantly later than those made during the preceding nine months. Specifically, the court noted that, during the nine months preceding the preference period, only nine of approximately 155 payments were more than fifty days old; twenty-four of the twenty-eight challenged payments were at least fifty or more days old. In other words, the bankruptcy court found that, during the preference period, Debtor's pattern of late payment changed significantly in that Debtor began paying invoices substantially later than during the preceding nine months' time. Thus, even though there had always been a pattern of late payments between the parties, the bankruptcy court found that payments made on invoices which were more than fifty days old were much later than payments made during the nine months preceding the preference

10

period so as to fall outside of the ordinary course of the parties' business relationship.

Expeditors makes two basic arguments on appeal. *First*, it asserts that it was ordinary for Debtor to make payments beyond the fifteen-day time limit and normal for Expeditors to make calls asking for payment. It further urges that the pattern of late payments was fairly consistent, pointing to the fact that during the nine months prior to the preference period Debtor paid invoices anywhere between fourteen and sixty-one days after invoice, while during the preference period these figures were twenty-five and eighty-one. According to Expeditors' more general view of the statistical evidence, the pattern of payment and the type of collection activity did not change significantly, with the result that it should have prevailed on this defense. *Second*, Expeditors asserts that the bankruptcy court's finding that the pattern of payment changed during the preference period, with Debtor paying invoices significantly later than during the pre-preference period, was without evidentiary support. It further argues that the court's "inconsiderate devotion to statistical analysis" misled it to select an arbitrary fifty-day benchmark, which was without support in the record.

In response to this argument, the Committee argues that the bankruptcy court applied the proper legal standard when it focused on whether the pattern of payments was significantly different during the preference period and that there was ample evidence to sustain the court's finding that it did. The Committee further asserts that the fifty-day cut-off selected by the court was not arbitrary, but rather was amply supported by the agreed upon exhibits which showed that most payments made during the nine months preceding the preference period were paid in fifty days or less.

The bankruptcy court correctly viewed the Eighth Circuit opinion in Lovett v. St. Johnsbury Trucking, 931 F.2d 494, 497 (8th Cir. 1991) as controlling. In Lovett, the lower courts had focused on the terms of a written contract between the parties to determine that late payments made during the preference period were not made in the ordinary course of the parties' business under § 547(c)(2)(B). The Eighth Circuit reversed. In reversing, the court emphasized that the analysis should focus, instead, on "the time within which the debtor ordinarily paid the creditor's invoices, and whether the timing of the payments during the 90-day period reflected 'some consistency' with the practice." Id. at 498. The Lovett court stated that the record showed not only that

payments were late during both the pre-preference and preference periods, but also that the length of delay between invoicing and payment remained fairly constant in both time periods (sixty-two versus fifty-two days). Thus, the court concluded that "[a]lthough it appears that payment generally was made somewhat sooner in the 90-day [preference] period than during the preceding 12 months, the difference was not sufficiently significant to show that the payments during the 90-day period did not follow the ordinary course of business reflected in the prior 12 months." Id.

In this case, the bankruptcy court did precisely what the Lovett court instructed. It recognized that a pattern of late payments can be ordinary even if made in contradiction to stated contract terms requiring earlier payment. It then looked to whether the pattern of late payments had altered significantly during the preference period. Its finding that Debtor had significantly changed its pattern of payment by making substantially later payments during the preference period was supported by stipulated exhibits. The bankruptcy court did not, as Expeditors urges, establish a fifty-day "bright line" test; the fifty-day time frame was based on documentary evidence showing that payments made during the nine months preceding the preference period had consistently been made prior to fifty days after the

13

date of the invoice.  Thus, contrary to Expeditors' arguments, the bankruptcy court applied the correct legal standard and made a factual finding which was amply supported by the evidence.  The bankruptcy court's determination that Expeditors had not met its burden of establishing this defense was not clearly erroneous.

B.     SECTION 547(C)(1): CONTEMPORANEOUS EXCHANGE FOR NEW VALUE

Section 547(c)(1) provides:

> (c)   The trustee may not avoid under this section a transfer--
>       (1)   to the extent the transfer was
>             (A)   intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
>             (B)   in fact a substantially contemporaneous exchange.

11 U.S.C. § 547(c)(1) (1994).  To establish a defense under § 547(c)(1), Expeditors had the burden of showing, by a preponderance of the evidence, that: (1) *both* parties intended the Debtor's payments during the preference period to be a contemporaneous exchange for new value; (2) that the exchange was in fact contemporaneous; and (3) that the Debtor received new value in exchange for the transfers.  Id. § 547(g); Lewellyn, 929 F.2d at 427.  The existence of intent, contemporaneousness, and new value are questions of fact.  Lewellyn, 929 F.2d at 427 (citing Creditors' Committee v. Spada (In re Spada), 903 F.2d 971, 975 (3d Cir. 1990)).

14

Expeditors' theory of recovery on this issue was based on the course of conduct which had developed between the parties whereby Expeditors would carefully watch the Debtor's account (one of its largest) and delay the release of goods until it received payment from Debtor on prior, overdue invoices. Expeditors asserted that its invoices, the credit agreement, and applicable law gave it a security interest in all goods in its possession, and that when it released goods in its possession upon receipt of the Debtor's payment of prior invoices, it provided a contemporaneous exchange for new value. The issue of whether such a security interest actually existed was hotly contested at trial, and even now on appeal. The bankruptcy court decision focused elsewhere.

The bankruptcy court held that Expeditors had not met its burden of proving that *Debtor* intended the payments to constitute a contemporaneous exchange for new value. This conclusion was founded on the testimony of a witness who had served as President, CEO, and CFO of the Debtor who testified that Expeditors had never discussed any such claimed security interest with him and that, even when he met with Expeditors to discuss the account, Expeditors made no mention of such a claim. The bankruptcy court further pointed out that no cross examination of this witness was conducted to establish either that the Debtor knew of the existence of such

15

a security agreement or that the Debtor intended such an exchange.  The bankruptcy court reasoned:  "[a] party cannot intend an exchange when one does not know of the existence of the matter to be exchanged.  In light of this unrebutted testimony, Expeditors cannot prevail on this element of the contemporaneous exchange defense . . . ."

Expeditors urges that it met its burden of proving that Debtor intended to release Expeditors' security interest for payment on earlier invoices.  In support of this assertion, Expeditors points to two types of evidence.  *First*, it asserts that the Credit Agreement and several hundred invoices which the parties exchanged contained language giving Expeditors a possessory lien, under certain conditions, and that knowledge of the content of these documents should be imputed to the Debtor corporation.  *Second*, it asserts that Debtor's intent to accept the release of a security interest in return for payments on old invoices should be inferred from the parties' course of conduct.  Expeditors also urges that the witness called by the Committee, while an officer of the Debtor, was not the Debtor's employee closest to the transactions on a day to day basis.

16

All of this amounts to reargument of the evidence and the reasonable inferences to be drawn therefrom; an argument that the bankruptcy court should have accepted Expeditors' view of the record rather than that urged by the Committee and adopted by the court. In this case the bankruptcy court was free to credit the testimony of a responsible officer of the company that the Debtor had not discussed a release of security arrangement with Expeditors. From this the bankruptcy court could draw the reasonable inference that the Debtor did not know of such release and that the Debtor did not intend to make a contemporaneous exchange. The fact that the parties spent considerable time at trial disputing whether Expeditors even had such a lien belies such an intent. Moreover, Expeditors failed to produce any evidence that both parties understood that Expeditors had such a security interest, tried to enforce it, or withheld goods in order to preserve its possessory lien, much less evidence that such an agreement existed.

"The critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange." <u>Lewellyn</u>, 929 F.2d at 428. Although the parties' course of conduct is evidence of this intent, <u>see id.</u>, such evidence is not the only evidence in this case. In this case,

17

there was contrary evidence, from a knowledgeable witness, upon which the court could reasonably find a lack of such intent on behalf of the Debtor. "When a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." Anderson, 470 U.S. at 575. Accordingly, we conclude that the bankruptcy court's decision with respect to this element of the defense was not clearly erroneous.

Based on the foregoing, the decision of the bankruptcy court is AFFIRMED.


A true copy.

Attest:


        CLERK, U.S. BANKRUPTCY APPELLATE PANEL
        FOR THE EIGHTH CIRCUIT