In re ED JEFFERSON CONTRACTING, INC., Debtor.

THE OFFICIAL UNSECURED CREDITORS' COMMITTEE OF ED JEFFERSON CONTRACTING, INC., Plaintiff,

v.

FORD MOTOR CREDIT COMPANY, Defendant.

Bankruptcy No. 95–45760–293.
Adversary No. 97–4237–293.

United States Bankruptcy Court,
E.D. Missouri.
Eastern Division.

July 10, 1998.

---

Scott Greenberg, St. Louis, MO, for Official Unsecured Creditors' Committee.

Thomas J. Noonan and Stephen J. Barber, St. Louis, MO, for Ford Motor Company.

## MEMORANDUM OPINION

DAVID P. McDONALD, Bankruptcy Judge.

### JURISDICTION

This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151, and 157 and Local Rule 9.01 of the United States District Court for the Eastern District of Missouri. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(F), which the Court may hear and determine.

### PROCEDURAL BACKGROUND

1. On September 25, 1995, Ed Jefferson Contracting, Inc., filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code (11 U.S.C. §§ 101–1330).

2. The Court approved Debtor's Second Amended Plan and Disclosure Statement on November 1, 1996. Article 6.7 of that plan gives the Official Unsecured Creditors' Committee for the bankruptcy estate (Committee) the power to prosecute all preferential transfer causes of action.

3. On September 23, 1997, the Committee filed this adversary complaint seeking to avoid, as preferences under section 547 of the Bankruptcy Code, two payments totaling $16,533.36 made to Ford Motor Company (Ford).

4. On November 6, 1995, Ford filed an Answer to the Committee's Adversary Complaint in which it denied both that Debtor was insolvent when it made the challenged transfers and that Ford received more as a result of the challenged transfers than it would have received if the debt owed to it had been paid through Debtor's Chapter 11 plan of reorganization.

5. The Committee filed a Motion for Summary Judgment (Motion 9) on January 27, 1998. The Committee filed a Memorandum in support of its Motion in which it argues that the payments to Ford were preferences that the trustee may avoid under section 547 of the Bankruptcy Code.

6. In support of its Motion, the Committee filed the affidavit of Scott Greenberg, the Committee's attorney. Greenberg attested that the estate currently has $175,000.00 of cash and $64,900.00 due to it from settlements, in addition to a $43,000.00 judgment, although the judgment may not be collectible. Additionally, Greenberg swore that the allowed priority claims against the estate total $642,079.23 and that the estate has not paid all of its administrative expenses.

7. The parties agreed to submit the case to the Court on cross motions for summary judgment.

8. Defendant filed a Response to Plaintiff's Motion for Summary Judgment in which it admitted: that Debtor made payments to it during the preference period; that such payments were on account of an antecedent debt; that Debtor was presumed to be insolvent at the time of the transfers; and that, based upon the assertions made in Greenberg's affidavit, the payments enabled it to receive more than it would have received had the payments not been made and had Ford been paid under the provisions of the Bankruptcy Code. Ford asserted that the payments the Committee seeks to avoid, although late under the terms of the parties' agreement, were made in the ordinary course of business, as defined in section 547(c)(2) of the Bankruptcy Code, and are, therefore, not avoidable.

9. On March 5, 1998, Defendant filed a Motion for Summary Judgment supported by a Memorandum.

10. In support of its Motion for Summary Judgment, Ford submitted three affidavits of Laura Shishkoff, the Customer Services Supervisor for Ford's commercial-lending office in Chicago. She attested to the validity of the documents Ford submitted to the Court including the lease it and Debtor entered into, supplements to the lease, and a comput-

er printout documenting the payments Debtor made under the lease. Shishkoff characterized the timeliness of Debtor's payments as irregular and attested that "it is customary and common in the industry for commercial lessors to work with a delinquent lessee and accept late payments rather then to terminate a lease altogether." Shishkoff also swore that Ford did not "employ any unusual or extraordinary means to collect the payments now challenged to be preferential." Shishkoff did not state the basis upon which she concluded that "it is customary and common in the industry for commercial lessors to work with a delinquent lessee and accept late payments rather than terminate a lease altogether." Shishkoff did not attest that she has worked at other commercial leasing companies, attended seminars or industry meetings where methods of dealing with delinquent lessees would have been discussed, or otherwise explained how she learned the manner in which others in the industry handle delinquent lessees.

11. The Committee filed a Response to Defendant's Motion for Summary Judgment on March 16, 1998. The Committee claims the challenged payments were not made in the ordinary course of business. The Committee points to the fact that, before the preference period, the average payment delay between Debtor and Ford was fifty-six days[1] and that the challenged payments were, respectively, made twenty-three and forty-one days late. The Committee argues that the thirty-three-day and fifteen-day differences are significant and prove that the challenged payments were not made in the ordinary course of business. The Committee also contends that Ford pressured Debtor to make the challenged payments and offers this suspected pressure as an explanation of why Debtor made the challenged payments

much sooner than it had been accustomed to making lease payments to Ford.

## FACTUAL BACKGROUND

Upon consideration of the entire record, the Court makes the following findings of fact:

1. Debtor and Ford entered into a lease and its supplements on September 2, 1993 (Lease) under which Ford agreed to lease to Debtor five heavy trucks.

2. Debtor made twenty-one payments to Ford before the preference payment.[2] These payments were often made late. The parties' pre-preference period history is summarized in the following chart:

| Date Due | Date Paid | Days Late |
|----------|-----------|-----------|
| 10/01/93 | September 1993 | 0 |
| 11/01/93 | 11/19/93 | 18 |
| 12/01/93 | 02/08/94 | 69 |
| 01/01/94 | 02/16/94 | 46 |
| 02/01/94 | 02/16/94 | 15 |
| 03/01/94 | 05/16/94 | 77 |
| 04/01/94 | 05/31/94 | 60 |
| 05/01/94 | 07/06/94 | 66 |
| 06/01/94 | 08/16/94 | 76 |
| 07/01/94 | 08/19/94 | 49 |
| 08/01/94 | 10/07/94 | 67 |
| 09/01/94 | 10/07/94 | 36 |
| 10/01/94 | 03/13/95 | 163 |
| 11/01/94 | 03/15/95 | 132 |
| 12/01/94 | 03/30/95 | 119 |
| 01/01/95 | 03/30/95 | 88 |
| 02/01/95 | 03/30/95 | 57 |
| 03/01/95 | 03/30/95 | 29 |
| 04/01/95 | 03/30/95 | 29 |
| 05/01/95 | 05/01/95 | 0 |
| 06/01/95 | 06/06/95 | 5 |

3. On average, Debtor's monthly lease payments to Ford during the pre-preference period were made 57.19 days late.

4. On July 19, 1995, Debtor transferred, via check, $8,243.60 to Ford (Payment 1) and

1. Using data provided by Ford, the Court calculates an average delay during the pre-preference period of 57.19 days.

2. In its memorandum supporting its motion for summary judgment, Defendant stated that there was a twenty-two payment, pre-preference period, history between it and Debtor. In detailing this history, Ford chronicled only twenty-one payments between it and Debtor. The Committee filed a response to Ford's motion for sum-

mary judgment and did not take issue with the payment history Ford detailed. Ford also filed an exhibit (Exhibit D) that detailed Debtor's payment history under the Lease and supplements thereto. Exhibit D, an internal document of Ford's Commercial Lending Services Department, is not easily deciphered. The Court, therefore, will accept the twenty-one payment as accurate.

on September 8, 1995, Debtor transferred, via check, $8,289.76 to Ford (Payment 2).

5. Payment One represented Debtor's monthly payment under the Lease due on July 1, 1995, and as such was received twenty-three days late.

6. Payment Two represented Debtor's monthly payment under the Lease due on September 1, 1995, and as such was received forty-one days late.

7. Payment Two included a late fee of $46.16.

## DISCUSSION

Pursuant to section 547(b) of the Bankruptcy Code, a bankruptcy trustee may avoid any transfer of property in which the debtor had an interest, provided that transfer meets the section's statutory definition of a preferential transfer.[3] Section 547(c), however, creates certain exceptions to the avoiding powers granted to the trustee in subsection (b). One such exception, the "ordinary course of business" defense, is found in section 547(c)(2).

■ In its Response to Plaintiff's Motion for Summary Judgment, Ford conceded that the two transfers the Committee seeks now to avoid were preferences within subsection 547(b). Ford, however, asserts that because the payments were made in the ordinary course of business they are excepted from the trustee's avoiding powers (being utilized by the Committee by subsection 547(c)). To the extent that Ford did not intend to concede that the challenged transfers were statutory preferences, the Court finds that the transfers meet section 547(b)'s elements for

an avoidable preference. The two transfers were made to Ford within ninety days of the filing of Debtor's bankruptcy and were made on account of an antecedent debt. Debtor made the two transfers while it was insolvent.[4] The administrative and priority claims against Debtor's bankruptcy estate exceed the available assets; therefore, receipt of the challenged transfers enabled Ford to receive more than it would have if: Debtor's case was one under Chapter 7, they had not been made, and Ford were paid under the provisions of Title 11.

Having concluded that the payments were preferences, the Court must examine whether Ford proved that the challenged payments were made in the ordinary course of business, as that term is used in section 547(c).

To establish an ordinary course of business defense to an alleged preference, a preference-action defendant must establish three statutory elements by a preponderance of the evidence. See 11 U.S.C. 547(g). Specifically, the defendant asserting that a challenged transfer was made in the ordinary course of business must prove:

1. that the debtor incurred the underlying debt in the ordinary course of business of the debtor and the transferee, 11 U.S.C. § 547(c)(2)(A);

2. that the debtor made the challenged transfer in the ordinary course of business or financial affairs of the debtor and the transferee, 11 U.S.C. § 547(c)(2)(B); and

3. that the challenged payment was made according to ordinary business terms, 11 U.S.C. § 547(c)(2)(C).

---

3. Section 547(b) provides:(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
   (1) to or for the benefit of a creditor;
   (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
   (3) made while the debtor was insolvent;
   (4) made—
      (A) on or within 90 days before the date of the filing of the petition; or
      (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—
   (A) the case were a case under chapter 7 of this title;
   (B) the transfer had not been made; and
   (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

4. Neither party presented evidence of Debtor's solvency during the ninety days before it filed its bankruptcy petition, but a debtor is presumed to have been insolvent during that period. See 11 U.S.C. § 547(f).

■ The Committee has not argued that the debt underlying the allegedly preferential transfers (i.e. the Lease and its supplements) was not incurred in the ordinary course of Debtor's or Ford's business. Although there was little evidence submitted on this element, it is reasonable to accept that Debtor, a contractor, routinely used heavy-duty trucks in its business and that leasing those vehicles was a viable option. Similarly, the Court recognizes that leasing heavy-duty trucks was a regular part of Ford's business. Because the Committee has not argued that the Lease and its supplements were entered into outside the ordinary course of Debtor's and Ford's businesses and because the parties' respective businesses encompass the leasing of heavy-duty trucks, the Court finds that the first element of the statutory ordinary course of business defense has been satisfied.

■ The second element of section 547(c)(2) is its "subjective" component and requires proof that the challenged payment is ordinary in relation to other business dealings between the debtor and creditor. *Official Plan Comm. v. Expeditors Int'l of Washington, Inc. (In re Gateway Pacific Corp.)*, 214 B.R. 870, 873 (8th Cir. BAP 1997). This requires the preference-action defendant to demonstrate some consistency between the allegedly preferential payment and other business transactions between it and the debtor. *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir.1991). There is, however, no precise legal test for determining whether a challenged payment was ordinary in relation to other business dealings between the debtor and creditor and resolution of this question requires the court to engage in a "peculiarly factual analysis." *Id.* quoting *In re Fulghum Construction Corp.*, 872 F.2d 739, 743 (6th Cir.1989).

The pattern of payment during the pre-preference period in this case is totally erratic or, to borrow a phrase from the Eighth Circuit, "irregular." *See Jones v. United Sav. and Loan Ass'n (In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.)*, 9 F.3d 680, 685 (8th Cir.1993) (Describing debtor's payments to preference action defendant as "irregular as to both time and amount"). In some instances Debtor made the monthly payments to Ford on time and in other cases, Debtor was as many as 163 days late in making payment. The average delay in payment during the pre-preference period was 57.19 days. Examining the payment history submitted by Ford, the Court notes that Debtor was particularly late in making its monthly payments to Ford for the last three months of 1994: the October payment was made 163 days late; the November payment was made 132 days late; and the December payment was made 119 days late. But for the last three months of 1994, the average delay in Debtor's payments to Ford would be 43.72 days. Review of Debtor's payment history with Ford also shows that during the last four months of the pre-preference period, Debtor paid Ford, on average, only 15.75 days late. The Court does not place particular significance on these short periods in which Debtor was either very late or relatively prompt in making payments under the Lease but, rather, mentions them, at this point, to illustrate the erratic nature of Debtor's history.

Although irregular, the Debtor's pre-preference period history of payments establishes that it routinely paid Ford late and that Ford accepted late payments. Determining that Debtor routinely made late payments to Ford during the pre-preference period, however, does not end the Court's inquiry under the 11 U.S.C. § 547(c)(2)(B), for it must also determine that there is "some consistency" between the payment pattern during the pre-preference period and the transfers alleged to be preferential. *See Lovett*, 931 F.2d at 498. *See also Official Plan Committee ex rel. Estate of Valley Steel Products Co. v. Whitewood Transportation Inc. (In re Valley Steel Products Co.)*, 166 B.R. 1006, 1010 (Bankr.E.D.Mo. 1993). Payment One which was made forty-one days after it was due clearly is within the pattern established by Debtor and Ford's pre-preference period dealings. The forty-one-day delay was well within the range of zero to 163 days in which the parties had operated and was only sixteen days from the average delay in payment during the pre-preference period. The Court finds

that Payment One was made in the ordinary course of dealing between Ford and Debtor.

Payment Two, made twenty-three days late requires closer examination for two reasons. One reason Payment Two requires more rigorous scrutiny is because it was made much sooner than the average payment during the pre-preference period. The second reason Payment Two requires closer examination is that it included a $46.16 late fee. Although Payment Two was made thirty-four days earlier than the average delay between Debtor and Ford during the pre-preference period, like Payment One, it was made well within the range of late payments made during the pre-preference period. Moreover, Payment Two, although thirty-four days early when compared to the average payment during the pre-preference period, was eight days later than the average payment delay of the final four monthly payments made during the pre-preference period. The Court concludes that Ford has demonstrated some similarity between Payment Two and the payments Debtor made to Ford during the pre-preference period. *See Lovett*, 931 F.2d at 497 ("[T]he cornerstone of [ § 547(c)(2)(B)] is that the creditor needs [to] demonstrate some consistency with other business transactions between the debtor and the creditor."). *See also In re Valley Steel Products Co.*, 166 B.R. at 1010 (17 day difference between delay in payment of allegedly preferential payment and next-longest delay in debtor's payment history was found to be not significant); *and Official Plan Committee ex. rel. Estate of Valley Steel Products Co. v. Zamzow Mfg. Inc. (In re Valley Steel Products Co.)*, 166 B.R 1001 (Bankr.E.D.Mo.1993) (late payment made 14 days later than latest payment between debtor and preference action defendant during pre-preference period did not significantly deviate from established payment pattern).

■ The Committee maintains that the $46.16 late fee pulls Payment Two out of the ordinary course of dealing between Debtor and Ford. To support its assertion, the Committee argues that during the pre-preference period Ford imposed a late fee only once and that, even then, the late fee was ultimately waived. The Court agrees with Ford that the late fee Ford required on Payment Two was *de minimis* in comparison to the $8,243.60 payment owed and, therefore does not pull Payment Two out of the ordinary course of dealing between Debtor and Ford.[5]

■ The Committee has argued that Payment Two (and Payment One) were made earlier than the average payment during the pre-preference period because Ford employed undue pressure to obtain payment. The Court rejects the Committee's unsubstantiated charge. The mere fact that the two challenged payments were made sooner than the average payment does not establish that Ford utilized undue pressure to obtain these payments. This is especially true in light of the facts that Shishkoff attested that no undue pressure was employed and that the monthly payments Debtor made during the final four months of the pre-preference period were made much sooner than the average payment was that preceded them. The two challenged payments continued the Debtor's trend, established during the final four months of the pre-preference period, of paying Ford sooner than it had previously paid Ford. Without holding what evidence would be sufficient to establish that Ford had employed undue pressure to extract the challenged payments from Debtor, the Court notes that the Committee did not present evidence that Ford threatened to repossess the trucks it had leased to Debtor or take other action if Debtor did not pay more promptly than it had previously. The Court finds that both Payment One and Payment Two were made in the ordinary course of business between Debtor and Ford.

■ The third element a defendant must prove to establish an ordinary course of business defense is that the challenged payment, or alleged preference, was made according to "ordinary business terms." 11 U.S.C.

---

**5.** Even if the Court were to agree with the Committee that Ford's assessment of a late fee against Debtor was not in the ordinary course of dealing between Debtor and Ford, the better course would be to declare only the late fee to be avoidable, not the rest of the payment which would otherwise be ordinary as between the parties.

§ 547(c)(2)(C). In the Memorandum it filed in support of its Motion for Summary Judgment, Ford cites *Jones v. United Sav. and Loan Ass'n (In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.),* 9 F.3d 680, 685 (8th Cir.1993) for the proposition that uncontroverted testimony from an officer of a preference-action defendant that the practice between the parties conformed to the industry practice suffices to prove the third element of the ordinary course of business defense. This Court had previously interpreted *In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.* in a manner similar to the interpretation given that case by Ford. *See Official Plan Committee ex rel. Estate of Valley Steel Products Co. v. Champion Distribution Servs. (In re Valley Steel Products Co.),* 166 B.R. 1012, 1015 (Bankr.E.D.Mo.1993) (reading *In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.* as holding that "the uncontroverted testimony of the defendant's president, chairman of the board and chief executive officer stating that it was common for savings and loan institutions to try to work with delinquent customers so long as the lender received some payment sufficed to carry the burden subsection (C) placed upon the defendant."); *see also In re Valley Steel Products Co.,* 166 B.R. at 1004. This, however, contrasts with the District Court for the Eastern District of Missouri's understanding of *In re U.S.A. Inns of Eureka Springs Arkansas, Inc. See Central Hardware Co., Inc. v. Walker–Willimas Lumber Co. (In re Spirit Holding Co.),* 214 B.R. 891, 900 (E.D.Mo.1997).

The *In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.* case involved allegations that payments the debtor made to a savings and loan institution under a promissory note it had assumed were preferential. 9 F.3d at 680. During the time before the preference period, the debtor had made payments to the preference-action defendant that were "irregular as to both time and amount, and were never in the amount of the full monthly installment." *Id.* at 681. The preference-action defendant offered the testimony of J.C. Benage, the Chairman of its Board, its President, and its Chief Executive Officer, to prove that its receipt of late payments from the debtor conformed to "ordinary business terms." *Id.* at 685. Benage, as recounted by the Eighth Circuit, "testified that it is regular practice in the savings and loan industry to work with delinquent customers as long as some type of payment is forthcoming, and that the Office of Thrift Supervision directed United [the preference-action defendant] to work with delinquent customers in a manner that conformed with industry wide standards." *Id.* Further, Benage testified that debtor's payments could be considered ordinary, given the circumstances, and that "United was encouraged and directed by regulatory authorities to work with customers [during] the 'so-called real estate crisis that [was] going on across the country.'" *Id.* The Eighth Circuit found "that Benage's testimony was sufficient to satisfy United's burden of proving industry-wide practice dealing with real estate trouble loans." *Id.* at 685.

In *In re Spirit Holding Co.,* Central Hardware, a subsidiary of the debtor that operated a retail hardware chain, sent a check to Walker–Williams, a lumber wholesaler, as payment for inventory received. 214 B.R. at 894. After receiving the check, Walker–Williams telephoned Central Hardware because Central Hardware's parent company, Spirit Holding Co., had recently filed bankruptcy. *Id.* Central Hardware volunteered to replace the check it had issued to Walker–Williams with a wire transfer. *Id.* The bankruptcy court found that the replacement of the check with a wire transfer during the ninety days before filing was not an avoidable transfer. *Id.* at 896. The bankruptcy court reasoned that a change in the method of payment, in and of itself, does not take a transaction outside the ordinary course of business. *Id.* In reaching its conclusion that the replacement nature of the wire transfer did not take it out of the ordinary course of business, the bankruptcy court placed great weight on the facts that the debtor had initiated the substitution and that Walker–Williams had not employed undue pressure in collecting the debt. *Id.* The district court held that the bankruptcy court had clearly erred in concluding that the substitution of the wire transfer for the check was within the ordinary course of business of the debtor and the creditor. *Id.* at 898.

Alternatively, the district court held that Walker–Williams had failed to prove that the allegedly preferential wire transfer was made according to ordinary business terms. *Id.* at 899. The district court noted "that 'ordinary business terms' refer to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection (C)." *Id.* quoting *In re Tolona Pizza Products Corp.*, 3 F.3d 1029, 1033 (7th Cir.1993). Then, the court examined the only evidence in the record concerning "ordinary business terms," the affidavit of John Gindville, Walker–Williams's Secretary, Treasurer, and Chief Financial Officer. 214 B.R. at 899. Specifically, the district court observed that Gindville attested he had worked for Walker–Williams for five years and that he knew the general payment terms of Walker–Williams's competitors from speaking with Walker–Williams's employees, customers and employees of Walker–Williams's competitors. *Id.* at 900. Additionally, Gindville attested that he obtained a familiarity with credit and collection practices within the wholesale lumber industry from his membership in the Building Materials Manufacturers Credit group of the National Association of Credit Management. Lastly, Gindville stated, in his affidavit, that Walker–Williams had previously deviated from its standard payment procedures with other customers and that such a practice was acceptable within the wholesale lumber industry. *Id.*

After reviewing Gindville's affidavit, the *In re Spirit Holding Co.* court concluded that it did not establish that replacing a previously issued check with a wire transfer was an ordinary practice within the wholesale lumber industry. *Id.* at 901. The district court noted both deficiencies in Gindville's base of knowledge and omissions from his affidavit. Regarding Gindville's knowledge of the industry and its payment practices, the court pointed out that when he attested to the industry's practices, Gindville had worked in the wholesale lumber industry for "only a few years" and had not worked for any of Walker–Williams's competitors. *Id.* Later, the court suggested Gindville could have provided a base for his alleged familiarity with the industry's collection practices by attesting to having learned of the standards at industry seminars or workshops. *Id.* In addition to criticizing Gindville's base of knowledge, the district court took exception with the statements in his affidavit, suggesting that, even if he had a knowledge of the industry's collection and payment standards, his affidavit did not set forth enough information for the court to conclude that the alleged preference conformed to those standards. For example, the district court observed, Gindville's affidavit did not state that stopping payment on a check and replacing it with a wire transfer was in the ordinary course of business or a common occurrence for either Walker–Williams or those of its unnamed competitors with whose collection practices Gindville claimed to be familiar. *Id.* The district court also criticized Gindville's affidavit for not specifically mentioning with which of Walker–Williams's competitors' practices Gindville was knowledgeable. *Id.* The district court concluded that Walker–Williams's "vague, generalized evidence is not the type that courts have found sufficient to meet the burden of establishing § 547(c)(2)(C)." *Id.* In contrast to Gindville's affidavit, the district court pointed to the affidavit submitted in *In re U.S.A. Inns of Eureka Springs Arkansas, Inc.* which it characterized as "specific, first-hand knowledge testimony." *Id.*

In the case at bar, Ford has offered only Shishkoff's affidavits as evidence that the challenged transfers and their late acceptance were accomplished according to ordinary business terms. Although the fact that she is a supervisor suggests a special competence and knowledge of the commercial truck leasing industry, Shishkoff does not attest to the length of time she has worked within the commercial truck leasing industry or how she is familiar with payment and collection practices within the commercial truck leasing industry. Like Gindville's affidavit, Shishkoff's affidavit fails to state how she learned what is ordinary in the industry. Shishkoff does not attest that she has attended seminars,

workshops or worked with industry associations that have developed standard practices.

The Court concludes, however, that Ford has met its burden of proving that Debtor's late payments and Ford's acceptance of them was within the ordinary business terms of the commercial-truck-leasing industry. The Court bases its conclusion on the fact that Shishkoff's affidavit is as complete and detailed as the affidavit the Eighth Circuit found to be satisfactory to prove "ordinary business terms" in *In re U.S.A. Inns of Eureka Springs Arkansas, Inc.*

Having found that Ford has established the elements of an ordinary course of business defense, the Court will grant its Motion for Summary Judgement and deny the Committee's Motion for Summary Judgment on its Complaint to Avoid Preferential Transfers.